UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| HELEN BEARD, Derivatively on Behalf of ACADIA HEALTHCARE COMPANY, INC., | Civil Action No. |
| Plaintiff, | |
| v. | |
| JOEY A. JACOBS, WILLIAM BRENT TURNER, RONALD M. FINCHER, DAVID DUCKWORTH, REEVE B. WAUD, WILLIAM F. GRIECO, WADE D. MIQUELON, WILLIAM M. PETRIE, E. PEROT BISSELL, CHRISTOPHER R. GORDON, VICKY B. GREGG, and HARTLEY R. ROGERS, | VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT |
| Defendants, | |
| and | |
| ACADIA HEALTHCARE COMPANY, INC., a Delaware corporation, | |
| Nominal Defendant. | JURY DEMAND |

Plaintiff Helen Beard ("Plaintiff"), by her attorneys, submits this Verified Stockholder Derivative Complaint for Violations of Federal Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment derivatively for the benefit of Nominal Defendant Acadia Healthcare Company, Inc. ("Acadia" or the "Company") and against certain current and former officers and directors of the Company. Plaintiff bases her allegations on personal knowledge and as to all other matters outside her personal knowledge, upon information and belief based on the investigation of counsel, which includes, without limitation: (i) review and analysis of public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) review and analysis of public filings in federal courts, including pleadings, papers, and any documents filed with, or publicly available from, the related consolidated securities fraud class action, *St. Clair Cnty. Emps. Ret. Sys. v. Acadia Healthcare Co., Inc.*, No. 3:18-cv-00988, filed October 1, 2018 (operative consolidated amended complaint filed April 1, 2019) (the "Securities Class Action"); and (iii) review of press releases, news reports, analyst reports, industry reports, investor conference call transcripts, and other information available in the public domain.

I.    INTRODUCTION

1.    This stockholder derivative action arises from the Board consciously causing and allowing Acadia to mislead the investing public regarding: (i) the Company's compliance with applicable laws, including environmental, health, and safety regulations, in Acadia's Proxy Statements, despite alarming incidents of abuse, neglect, and death of patients while at Acadia's healthcare facilities, causing Acadia's stockholders to vote to reelect certain directors to the Company's Board of Directors ("Board") and to vote against a stockholder proposal to adopt a policy requiring the Company to prepare a sustainability report without adequate information to make a reasonably informed decision; (ii) the quality of Acadia's patient care; (iii) the Company's

1

staffing of its facilities to ensure appropriate care to its patients; and (iv) the performance of the Company's United Kingdom ("U.K.") operations as garnering significant revenue and continuing to grow in the face of adverse industry trends. Moreover, certain of the Individual Defendants (defined herein) reaped over $1 billion in insider trading proceeds of common stock, in addition to the millions of dollars in executive compensation and directors' fees unjustly awarded to them while the Company operated under their direction.

2.     At all relevant times, Acadia was a for-profit healthcare services company that operated inpatient psychiatric facilities, residential treatment centers, group homes, substance abuse facilities, and facilities providing outpatient behavioral healthcare services in the United States, the U.K., and Puerto Rico. The Company has, and had at all relevant times, two business segments across these regions—the U.S. segment, consisting of more than 200 behavioral healthcare facilities and roughly 9,300 beds, and the U.K. segment, consisting of more than 370 behavioral healthcare facilities and roughly 8,800 beds. The Company's U.K. operations generate a significant portion of the Company's revenues. For example, in fiscal year 2016, U.K. publicly-funded sources accounted for approximately 36% of the Company's revenues.

3.     In violation of applicable laws and regulations, Acadia did not provide adequately staffed facilities or quality care to its patients, but instead, the Company prioritized profits over patients. In an effort to cut costs and competition, the Company recently focused on an expansion of its healthcare services in the U.K. through acquiring small companies in its same market. For example, in December 2015, Acadia touted the acquisition of numerous smaller healthcare groups and clinics in the U.K. The Company then completed its biggest wager to date on February 16, 2016, a $2.2 billion cash and stock acquisition of Priory Group No. 1 Limited ("Priory"). Priory

was the largest independent provider of mental health care facilities in the U.K., operating 324 facilities with approximately 7,100 beds.

4.      In addition to its strategic acquisition strategy, Acadia also sought to improve margins by increasing beds and simultaneously reducing staffing costs, the Company's single largest expense, by understaffing and hiring unqualified staff.  Understaffing and a failure to monitor Acadia's patients adequately were cited in government reports and lawsuits as contributing to the disturbingly high rates of suicides and sexual assaults occurring at Acadia's facilities.

5.      Indeed, in October 2018, Aurelius Value published a report and released a video documenting systematic instances of patient abuse and neglect at dozens of Acadia's facilities, the cause of which was primarily understaffing.  The report analyzed inspection reports by the Centers for Medicare & Medicaid Services ("CMS") spanning 2013 to 2018 for 31 of the 40 U.S. hospitals publicly available on Acadia's website.  The report concluded that federal inspectors had uncovered staffing deficiencies in over 90% of Acadia's hospitals, and of those understaffed hospitals, 89% were also cited for deficiencies in patient safety and/or care, including reports of improper use of restraints, physical and sexual assaults, and even suicides and death.

6.      Despite these issues afflicting the Company, in Acadia's Proxy Statements, the Individual Defendants (as defined herein), bragged that the Company "conduct[s] [its] business in compliance with applicable law including environmental, health and safety regulations" and misleadingly assured investors that Acadia has "in place policies and practices concerning environmental, social and governance issues that underscore [its] commitment to being a good citizen."  Based on these assurances, Acadia stockholders voted to reelect certain directors to the Company's Board and voted against a stockholder proposal to adopt a policy requiring the

Company to prepare a sustainability report without the information necessary to make a reasonably informed decision.

7.     In addition, the Individual Defendants also misleadingly assured investors that the Company's acquisition of Priory would lead to record profits and earnings in 2017, when they had no reasonable basis to believe, and did not in fact believe, these statements. Indeed, the Individual Defendants knew of negative media reports regarding Priory's facilities in 2017.

8.     Moreover, the Individual Defendants misleadingly touted the quality of its U.K. operations as giving the Company a "competitive strength" that would drive future growth and profitability. According to Acadia's public filings and press releases, "[f]avorable industry and legislative trends" would also facilitate the Company's growth. This, despite overwhelming negative trends in the U.K.'s healthcare services industry, including lower census, higher operating costs, and a tightening labor market.

9.     Although the Individual Defendants were aware of these negative trends in the U.K. healthcare market, these trends were not revealed publicly until October 24, 2017, when the Company issued a press release announcing that the Company had badly missed its Q3 2017 revenue and earnings targets and was drastically reducing its guidance for the remainder of 2017 to be in the range of $2.23 to $2.25 per diluted share from its previously reaffirmed guidance of $2.42 to $2.47 per diluted share. Acadia attributed its poor financial results and lowered guidance directly to "a lower census and higher operating costs" due to "seasonal softness" and a "tightening in the labor market," among other things.

10.    On this news, shares of Acadia stock plummeted *nearly 26%*, or $11.44 per share, on October 25, 2017, to close at $32.68 per share, compared to the previous trading day's closing of $44.12 per share, erasing more than *$1 billion* in market capitalization in a single day.

11.     Despite this news, the Individual Defendants continued to keep the truth hidden. For example, months later, on February 22, 2018, the Company held an earnings call with analysts and investors to discuss Acadia's Q4 2017 results, during which the Individual Defendants touted the Company's performance and made positive statements about Acadia's long-term outlook. Likewise, in a May 1, 2018 press release announcing Acadia's financial and operating results for Q1 2018, the Individual Defendants boasted about the Company's "rebound in same facility revenue for the quarter" and actual and anticipated growth through 2018. Then, on July 31, 2018, during another earnings call to discuss the Company's Q2 2018 results, the Individual Defendants touted Acadia's performance, stating Acadia's "operations in the UK produced their best same facility growth in two years with an increase in same facility revenue of 5.6%, consisting of a 1.6% increase in patient days and a 3.9% increase in revenue per patient day."

12.     It was not until November 5, 2018, after the market closed, that the Company issued a press release announcing its Q3 2018 results and revealing that the Company had slashed its full-year 2017 earnings guidance to be in the range of $2.25 to $2.27 per diluted share, down from its previous guidance of $2.52 to $2.56. Then, during an earnings call the following day on November 6, 2018, the Individual Defendants disclosed that the lowered guidance was the result of the fact that "the nurse shortage continues and actually grows."

13.     In the two trading days following the news of the Company's disappointing and unexpected financial results and significantly lowered financial guidance, Acadia's stock price fell $5.75 per share, or nearly 13%, to close at $39 per share on November 6, 2018, erasing more than $507 million in market capitalization.

14.     Defendants, however, did not fare nearly as poorly as the Company. Certain of the Individual Defendants have unlawfully reaped over *$1 billion* in illegal insider-trading proceeds

of Company stock.  In addition, during this time, certain of the Individual Defendants collectively pocketed millions of dollars in executive compensation and directors' fees not justified by Acadia's actual performance while under their stewardship.

15.     Further, as a direct result of this unlawful course of conduct, the Company is now the subject of the Securities Class Action.  The Securities Class Action seeks claims against Acadia and certain of the Individual Defendants in connection with the Company's improper statements concerning Acadia's operations and prospects, including causes of action under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

16.     Due to their direct involvement in the wrongdoing and substantial likelihood of liability its members face, any demand upon the Board to rectify the wrongdoing described herein would be a wasteful and useless act.  Accordingly, plaintiff brings this action against the Individual Defendants to repair the harm that they caused with their faithless actions.

## II.     JURISDICTION AND VENUE

17.     Pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of sections 10(b) and 14(a) of the Exchange Act and SEC Rule 10b-5 and 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

18.     This Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District or is an individual who is either present in this District for jurisdictional purposes or has, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets, such that each Defendant has sufficient minimum

contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

19.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(b) because (i) Acadia maintains its principal place of business in this District; (ii) one or more of the Defendants reside(s) or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein—including the Individual Defendants' primary participation in the wrongful acts—occurred in this District; and (iv) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

III.    THE PARTIES

A.      Plaintiff

20.     Plaintiff Helen Beard is a current stockholder of Acadia and has continuously owned such shares since 1997.

21.     Plaintiff will hold Acadia shares continuously throughout the pendency of this action.  Plaintiff brings this action derivatively in the right of, and for the benefit of, Acadia. Plaintiff will fairly and adequately represent the interests of Acadia and its stockholders in enforcing the rights of the Company.

B.      Nominal Defendant

22.     Nominal Defendant Acadia is a Delaware corporation with principal executive offices located at 6100 Tower Circle, Suite 1000, Franklin, Tennessee.  Accordingly, Acadia is a citizen of Delaware and Tennessee.  Trading on the NASDAQ under the ticker symbol "ACHC," Acadia is one of the largest publicly traded behavioral healthcare companies in the country.  As of December 31, 2018, the Company operated a network of 583 behavioral healthcare facilities with approximately 18,100 beds across 40 states, the U.K., and Puerto Rico.

7

## C. Individual Defendants

23. Defendant Joey A. Jacobs ("Jacobs") was an Acadia director from February 2011 until at least December 2018. Defendant Jacobs was also Acadia's Chairman of the Board and Chief Executive Officer ("CEO") from February 2011 to December 2018. Prior to joining Acadia in February 2011, defendant Jacobs co-founded Psychiatric Solutions, Inc. ("PSI") and served as its Chairman, President, and CEO from April 1997 to November 2010. On December 16, 2018, Jacobs was fired by Acadia's Board. Defendant Jacobs knowingly, recklessly, or with gross negligence: (i) caused or allowed Acadia to disseminate improper statements concerning its U.K. operations and the Company's financial guidance and growth prospects; (ii) failed to implement and maintain adequate disclosure controls with respect to the Company's operations and financial guidance; and (iii) failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention and appropriately addressed. Defendant Jacobs also negligently violated section 14(a) of the Exchange Act by causing Acadia to make misleading statements in its 2017 and 2018 Proxy Statements. Acadia paid defendant Jacobs the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2017 | $1,124,500 | $6,971,915 | $532,586 | $4,099 | $8,633,100 |

Additionally, while the price of Acadia stock was artificially inflated and defendant Jacobs was in possession of material, adverse, non-public information concerning Acadia, he sold 797,967 shares of personally held Acadia stock at artificially inflated prices for proceeds of

$45.1 million. Defendant Jacobs is named as a defendant in the Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act.

24.     Defendant William Brent Turner ("Turner") has served as Acadia's President since April 2012. Defendant Turner was also Acadia's Co-President from February 2011 to April 2012. Prior to joining Acadia in February 2011, Turner served as the Executive Vice President of Finance and Administration of PSI from August 2005 to November 2010 and as Vice President, Treasurer and Investors Relations of PSI from February 2003 to August 2005. Defendant Turner knowingly, recklessly, or with gross negligence: (i) caused or allowed Acadia to disseminate improper statements concerning its U.K. operations and the Company's financial guidance and growth prospects; (ii) failed to implement and maintain adequate disclosure controls with respect to the Company's operations and financial guidance; and (iii) failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention and appropriately addressed. Acadia paid defendant Turner the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2017 | $624,000 | $1,403,990 | $193,237 | $2,946 | $2,224,173 |

Additionally, while the price of Acadia stock was artificially inflated and defendant Turner was in possession of material, adverse, non-public information concerning Acadia, he sold 294,595 shares of personally held Acadia stock at artificially inflated prices for proceeds of $15.9 million. Defendant Turner is named as a defendant in the Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.

9

25.     Defendant Ronald M. Fincher ("Fincher") is Acadia's Chief Operating Officer and has been since February 2011.  Defendant Fincher knowingly, recklessly, or with gross negligence: (i) caused or allowed Acadia to disseminate improper statements concerning its U.K. operations and the Company's financial guidance and growth prospects; (ii) failed to maintain adequate disclosure controls with respect to the Company's operations and financial guidance; and (iii) failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention and appropriately addressed.  Defendant Fincher also negligently violated section 14(a) of the Exchange Act by causing Acadia to make misleading statements in its 2017 and 2018 Proxy Statements.  Acadia paid defendant Fincher the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2017 | $676,000 | $1,520,986 | $209,340 | $4,099 | $2,410,425 |

Additionally, while the price of Acadia stock was artificially inflated and defendant Fincher was in possession of material, adverse, non-public information concerning Acadia, he sold 275,572 shares of personally held Acadia stock at artificially inflated prices for proceeds of $15 million.

26.     Defendant David Duckworth ("Duckworth") is Acadia's Chief Financial Officer and has been since July 2012.  Defendant Duckworth was also Acadia's Chief Accounting Officer from January 2012 to July 2012 and Controller from April 2011 to January 2012.  Defendant Duckworth knowingly, recklessly, or with gross negligence: (i) caused or allowed Acadia to disseminate improper statements concerning its U.K. operations and the Company's financial

guidance and growth prospects; (ii) failed to maintain adequate disclosure controls with respect to the Company's operations and financial guidance; and (iii) failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention and appropriately addressed. Acadia paid defendant Duckworth the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2017 | $598,900 | $1,048,078 | $163,645 | $13,512 | $1,824,135 |

Additionally, while the price of Acadia stock was artificially inflated and defendant Duckworth was in possession of material, adverse, non-public information concerning Acadia, he sold 64,203 shares of personally held Acadia stock at artificially inflated prices for proceeds of $4.4 million. Defendant Duckworth is named as a defendant in the Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.

27. Defendant Reeve B. Waud ("Waud") is Acadia's Chairman of the Board and has been since December 2018 and a director and has been since December 2005. Defendant Waud was also Acadia's Lead Director from April 2012 to December 2018. Defendant Waud knowingly or recklessly: (i) caused or allowed Acadia to disseminate improper statements concerning its U.K. operations and the Company's financial guidance and growth prospects; (ii) failed to maintain adequate disclosure controls with respect to the Company's operations and financial guidance; and (iii) failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention and appropriately addressed. Defendant Waud also negligently violated

section 14(a) of the Exchange Act by causing Acadia to make misleading statements in its 2017 and 2018 Proxy Statements. Acadia paid defendant Waud the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $132,000 | $159,985 | $291,985 |

Additionally, while the price of Acadia stock was artificially inflated and defendant Waud was in possession of material, adverse, non-public information concerning Acadia, entities associated with Waud sold 10,438,846 shares of Acadia stock at artificially inflated prices for proceeds of $559.6 million.

28.     Defendant William F. Grieco ("Grieco") is an Acadia director and has been since November 2011. Defendant Grieco was also the Chair of Acadia's Audit Committee from at least November 2012 to the present. Defendant Grieco knowingly or recklessly: (i) caused or allowed Acadia to disseminate improper statements concerning its U.K. operations and the Company's financial guidance and growth prospects; (ii) failed to maintain adequate disclosure controls with respect to the Company's operations and financial guidance; (iii) failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention and appropriately addressed. Defendant Grieco also negligently violated section 14(a) of the Exchange Act by causing Acadia to make misleading statements in its 2017 and 2018 Proxy Statements. Acadia paid defendant Grieco the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $127,000 | $159,985 | $286,985 |

Additionally, while the price of Acadia stock was artificially inflated and defendant Grieco was in possession of material, adverse, non-public information concerning Acadia, he sold 17,522 shares of personally held stock at artificially inflated prices for proceeds of $862.9 thousand.

29.    Defendant Wade D. Miquelon ("Miquelon") is an Acadia director and has been since January 2012.  Defendant Miquelon knowingly or recklessly: (i) caused or allowed Acadia to disseminate improper statements concerning its U.K. operations and the Company's financial guidance and growth prospects; (ii) failed to maintain adequate disclosure controls with respect to the Company's operations and financial guidance; and (iii) failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention and appropriately addressed.  Defendant Miquelon also negligently violated section 14(a) of the Exchange Act by causing Acadia to make misleading statements in its 2017 and 2018 Proxy Statements.  Acadia paid defendant Miquelon the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $114,500 | $159,985 | $274,485 |

30.    Defendant William M. Petrie ("Petrie") is an Acadia director and has been since October 2012.  Defendant Petrie knowingly or recklessly: (i) caused or allowed Acadia to disseminate improper statements concerning its U.K. operations and the Company's financial guidance and growth prospects; (ii) failed to maintain adequate disclosure controls with respect to the Company's operations and financial guidance; and (iii) failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention and appropriately addressed.  Defendant Petrie also negligently violated section 14(a) of the Exchange

Act by causing Acadia to make misleading statements in its 2017 and 2018 Proxy Statements. Acadia paid defendant Petrie the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $109,500 | $159,985 | $269,485 |

Additionally, while the price of Acadia stock was artificially inflated and defendant Petrie was in possession of material, adverse, non-public information concerning Acadia, he sold 1,000 shares of personally held Acadia stock at artificially inflated prices for proceeds of $67.5 thousand.

31.     Defendant E. Perot Bissell ("Bissell") is an Acadia director and has been since April 2013.  Defendant Bissell was also a member of Acadia's Audit Committee from at least April 2013 to the present.  Defendant Bissell knowingly or recklessly: (i) caused or allowed Acadia to disseminate improper statements concerning its U.K. operations and the Company's financial guidance and growth prospects; (ii) failed to maintain adequate disclosure controls with respect to the Company's operations and financial guidance; and (iii) failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention and appropriately addressed.  Defendant Bissell also negligently violated section 14(a) of the Exchange Act by causing Acadia to make misleading statements in its 2017 and 2018 Proxy Statements. Acadia paid defendant Bissell the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $124,000 | $159,985 | $283,985 |

32.     Defendant Christopher R. Gordon ("Gordon") is an Acadia director and has been since February 2015.  Defendant Gordon knowingly or recklessly: (i) caused or allowed Acadia to

disseminate improper statements concerning its U.K. operations and the Company's financial guidance and growth prospects; (ii) failed to maintain adequate disclosure controls with respect to the Company's operations and financial guidance; and (iii) failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention and appropriately addressed. Defendant Gordon also negligently violated section 14(a) of the Exchange Act by causing Acadia to make misleading statements in its 2017 and 2018 Proxy Statements. Acadia paid defendant Gordon the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $99,500 | $159,985 | $259,485 |

Additionally, while the price of Acadia stock was artificially inflated and defendant Gordon was in possession of material, adverse, non-public information concerning Acadia, entities associated with Gordon sold 5,803,339 shares of Acadia stock at artificially inflated prices for proceeds of $366.5 million.

33. Defendant Vicky B. Gregg ("Gregg") is an Acadia director and has been since May 2016. Defendant Gregg knowingly or recklessly: (i) caused or allowed Acadia to disseminate improper statements concerning its U.K. operations and the Company's financial guidance and growth prospects; (ii) failed to maintain adequate disclosure controls with respect to the Company's operations and financial guidance; and (iii) failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention and appropriately addressed. Defendant Gregg also negligently violated section 14(a) of the Exchange

Act by causing Acadia to make misleading statements in its 2017 and 2018 Proxy Statements. Acadia paid defendant Gregg the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $99,500 | $159,985 | $259,485 |

34.     Defendant Hartley R. Rogers ("Rogers") was an Acadia director from April 2013 to May 2018.  Defendant Rogers was also a member of Acadia's Audit Committee from at least April 2013 to May 2018.  Defendant Rogers knowingly or recklessly: (i) caused or allowed Acadia to disseminate improper statements concerning its U.K. operations and the Company's financial guidance and growth prospects; (ii) failed to maintain adequate disclosure controls with respect to the Company's operations and financial guidance; and (iii) failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention and appropriately addressed.   Defendant Rogers also negligently violated section 14(a) of the Exchange Act by causing Acadia to make misleading statements in its 2017 and 2018 Proxy Statements.  Acadia paid defendant Rogers the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $102,000 | $159,985 | $261,985 |

35.     Defendants Jacobs, Turner, Fincher, and Duckworth are collectively referred to herein as the "Officer Defendants."

36.     Defendants Waud, Grieco, Miquelon, Petrie, Bissell, Gordon, Gregg, and Rogers are collectively referred to herein as the "Director Defendants."

37.     Defendants Grieco, Bissell, and Rogers are collectively referred to herein as the "Audit Committee Defendants."

38.     Defendants Jacobs, Turner, Waud, Gordon, Duckworth, Petrie, Fincher, and Grieco are collectively referred to herein as the "Insider Selling Defendants."

39.     Collectively, the defendants identified in ¶¶ 23–34 are referred to herein as the "Individual Defendants."

## IV.   THE DEFENDANTS' FIDUCIARY DUTIES

### A.    The Fiduciary Duties of the Individual Defendants

40.     By reason of their positions as present or past officers and/or directors of Acadia and because of their responsibility to control the business and corporate affairs of the Company, the Individual Defendants owed, and owe, the Company and its stockholders the fiduciary obligations of good faith, loyalty, due care, and candor and were, and are, required to use their utmost ability to control and manage the Company in a just, honest, fair, and equitable manner. Each Individual Defendant owed, and owes, the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, as well as the highest obligations of fair dealing, and not to act in furtherance of their personal interest or benefit.

41.     Because of their positions of control and authority as directors and/or officers of Acadia, the Individual Defendants were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Acadia, each of the Individual Defendants had knowledge of material, non-public information regarding the Company.  In addition, as officers and/or directors of a publicly-held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business, operations, and financial

prospects so that the market price of the Company's stock would be based on truthful and accurate information.

42. To discharge their duties, the Individual Defendants were, and are, required to exercise reasonable and prudent oversight and supervision over the management, policies, practices, and controls of Acadia. By virtue of such duties, the Individual Defendants were, and are, required to, among other things:

a. exercise good faith to ensure that the Company was operated in a diligent, efficient, honest, and prudent manner and in accordance with all applicable laws (including federal and state laws, government rules and regulations, and the Company's Certificate of Incorporation and Bylaws);

b. neither violate nor knowingly permit any officer, director, or employee of Acadia to violate any applicable laws, rules, or regulations;

c. remain informed as to the status of Acadia's operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection thereto, and to take steps to correct such conditions or practices;

d. establish and maintain systematic and accurate records and reports of the business and affairs of Acadia and procedures for the reporting of the Company's business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

e. maintain and implement an adequate, functioning system of internal controls, such that the affairs and operations of Acadia are conducted in accordance with all applicable laws, rules, and regulations; and

f. truthfully and accurately guide investors and analysts with respect to the business operations of the Company.

**B. Additional Duties Pursuant to the Company's Code of Conduct**

43. The Individual Defendants, as officers and/or directors of Acadia, were also bound by the Company's Code of Conduct (the "Code"), which requires "each officer, employee and member of Acadia's Board of Directors . . . to comply with the law and to conduct Acadia's business in an ethical manner." Among other things, the Code addressed the Individual

Defendants' responsibilities with respect to the accuracy of the Company's public statements and

reports to the SEC, stating:

**Making False Reports to Government Agencies and Auditors**

Federal law prohibits making any false, fictitious or fraudulent statement or report to any federal governmental agency. Hiding or concealing any material fact that would make a statement or report misleading by its omission is also illegal. Many states have enacted similar laws. In addition, Acadia's internal and external auditors gather information that may be reported to federal or state agencies or disclosed in accordance with federal or state law. Acadia requires that all information provided on its behalf to any governmental agency or by any employee to any internal or external auditor be true and complete (to the Company's best knowledge) in all material respects at the time provided.

44. The Code also required that the Individual Defendants to refrain from trading the

Company's stock on the basis of confidential information. In particular, the Code stated:

**Insider Trading**

Employees who have access to confidential information are not permitted to use or share that information for stock trading purposes or for any other purpose except the conduct of our business. All non-public information about the Company or any company with which we do business should be considered confidential information. To use non-public information for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical but also illegal. In order to assist with compliance with laws against insider trading, the Company has adopted a specific policy governing employees' trading in securities of the Company. This policy has been distributed to every employee. If you have any questions, please consult the Company's Legal Department.

**C.     Additional Fiduciary Duties of the Audit Committee Defendants**

45. In addition to the fiduciary duties discussed above, the Audit Committee

Defendants owed specific duties to Acadia under the Audit Committee's Charter (the "Audit

Charter"). According to the Audit Charter, the Audit Committee was responsible for assisting the

Board in overseeing: (i) the quality and integrity of the Company's financial statements; (ii) the

Company's compliance with legal and regulatory requirements; (iii) the Company's disclosure

controls and procedures; and the Company's internal control over financial reporting. Among

other things, the Audit Committee Charter obligated the Audit Committee Defendants to provide the Board with the results of the Audit Committee's monitoring and recommendations derived therefrom and provide to the Board such additional information and materials "necessary to make the Board aware of significant financial matters that require the attention of the Board." The Audit Committee is also charged with reviewing and discussing "with management the Company's major risk exposures with respect to the Company's accounting and financial reporting policies and procedures and the measures management has taken to monitor, measure and control such exposures and elicit recommendations for the improvement of the Company's risk assessment and mitigation procedures." To discharge these duties, the Audit Committee is empowered to "[i]nstitute special investigations with full access to all books, records, facilities and personnel of the Company, when the Committee, in its sole discretion deems such an investigation is necessary."

### D. Control, Access, and Authority

46.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Acadia, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Acadia.

47.     Because of their advisory, executive, managerial, and directorial positions with Acadia, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Acadia.

48.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Acadia and was at all times acting within the course and scope of such agency.

### E. Reasonable and Prudent Supervision

49. To discharge their duties, the officers and directors of Acadia were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Acadia were required to, among other things:

> a. ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;
>
> b. conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest-quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;
>
> c. properly and accurately guide stockholders and analysts as to the true business practices, operations, and financial prospects of the Company at any given time, including making accurate statements about the Company's business practices, operations, and financial prospects, as well as its internal controls;
>
> d. remain informed as to how Acadia conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices, and make such disclosures as necessary to comply with securities laws;
>
> e. refrain from trading on material, adverse, non-public information; and
>
> f. ensure that Acadia was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## V. BREACHES OF DUTIES

50. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Acadia, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

51. The Individual Defendants breached their duty of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls designed to ensure that critical health and safety issues were brought to the Board's attention, which allowed the defendants to cause, or by themselves caused, the Company to operate unsafe facilities, placing Acadia's largest revenue source in jeopardy. The Individual Defendants also breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused Acadia to incur substantial damage.

52. The Audit Committee members had a duty to review the Company's earnings press releases and regulatory filings. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the improper statements detailed herein and failing to properly oversee Acadia's public statements and internal control functions.

53. The Insider Selling Defendants further breached their duty of loyalty by selling Acadia stock on the basis of material, proprietary, and nonpublic information before that information was revealed to the Company's stockholders.

54. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Acadia, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of defendants' improper course of conduct, the Company is now the subject of the Securities Class Action that alleges violations of federal securities laws. As a result, Acadia has expended, and will continue to expend, significant sums of money.

## V.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

55.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct alleged herein as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

56.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Acadia, regarding the Company's financial prospects and the Individual Defendants' management of Acadia's operations; (ii) facilitate the Insider Selling Defendants' illicit sale of over $1 billion worth of their personally held shares, or caused an entity they controlled to sell Acadia shares, while in possession of material, nonpublic information; and (iii) enhance the Individual Defendants' executive and directorial positions at Acadia and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

57.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

58.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

23

59. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

60. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VI.  FACTUAL ALLEGATIONS[1]

### A.  The Individual Defendants Engage in a Series of Acquisitions to Expand the Company into the U.K.

61. Formed in 2005, Acadia provides healthcare services in the U.S., the U.K., and Puerto Rico. Publicly funded sources, such as the National Health Service, provide the vast majority of the Company's revenues. Specifically, more than 50% of the Company's revenues are sourced from state governments under their respective Medicaid programs, and the federal government under the Medicare program.

62. Defendant Waud and his company, Waud Capital Partners, founded Acadia. In March 2011, Acadia announced that defendant Jacobs would join the Company as CEO. Just two months later, in connection with a merger with Pioneer Behavior Health, defendant Jacobs

_____

[1] All textual emphases are added unless otherwise stated.

recruited former colleagues who had worked under him at his previous company, PSI, to Acadia, including defendants Turner and Fincher.

63.     While the CEO of PSI, Jacobs initiated the same roll-up strategy he would later bring to bear on Acadia.  Founded in 1997, from 2003 to 2008, PSI grew from five facilities to ninety-five facilities, with profits surging from $5 million to $76 million.  However, these profits were generated based on Jacobs' secret growth strategy of understaffing, resulting in woefully inadequate patient care.  Indeed, the *Los Angeles Times* reported on PSI's "well-honed business formula" of reducing staff and filling beds for increased profits, stating that "poor patient supervision, understaffing and inadequate worker training have led to instances of chaos and brutality."  The *Los Angeles Times* further reported incidents of PSI hospitals cited for patient deaths, rape, and vast federal and state citations.

64.     The claims of malpractice and neglect surrounding PSI even caught the attention of several U.S. Congressmen.  Congressman Ronnie Shows in 2017 stated that a government analysis determined Medicare fraud costs the American taxpayer over $50 billion annually, noting that "[o]ne company with a problematic record [is] Psychiatric Solutions, Inc."  Likewise, former U.S. Congressman Bart Stupak, writing for *The Hill* in 2017, described PSI as "an example of one bad actor that put profit ahead of care and was surely a questionable recipient of taxpayer funds."

65.     In addition to media spotlight for patient neglect and malpractice, in 2010, the U.S. Department of Justice ("DOJ") began investigating PSI's executive pay, which, according to an article published in the *Tennessean*, was triggered by the timing of PSI's compensation committee award to PSI's top executives, including defendant Jacobs, of tens of millions of dollars in options and restricted stock grants while secretly engaging in negotiations to sell the company.  In total, PSI's senior executives granted themselves massive compensation packages totaling more than

$200 million before acknowledging that they were auctioning off the company.  Universal Health Services acquired PSI, along with all its liabilities, for $3.1 billion in May 2010.  Some of the investigations regarding PSI's former facilities remain ongoing today.

66.     Just like he had done with PSI, after joining Acadia, Jacobs focused on expanding the Company's behavioral healthcare services in the U.K. alongside his former colleagues at PSI. On February 16, 2016, the Company completed the acquisition of Priory for a total purchase price of approximately $2.2 billion, including cash consideration of $1.9 billion and the issuance of approximately four million shares of common stock to Priory stockholders.  Prior to Acadia's acquisition of Priory, Priory was an independent provider of behavioral healthcare services in the U.K., operating 324 facilities with approximately 7,100 beds at the time of acquisition.

67.     The Company's U.K. operations generate a significant portion of the Company's revenues.  In fiscal year 2017, for example, U.K. publicly funded sources provided approximately 32% of the Company's revenues.   Accordingly, Acadia's U.K. operations and financial performance were a central focus for the Company.

68.     In March 2014, Acadia had expanded from its years of acquisitions to 52 facilities and 4,200 beds in the United States.  The Individual Defendants now sought to expand overseas.

69.     In July 2014, Acadia acquired the U.K. company Partnerships in Care ("PiC"), then the second-largest independent provider for inpatient behavioral healthcare services in the U.K., for roughly $662 million.  The PiC acquisition was Acadia's first foray into a foreign market, and Acadia wasted no time expanding on its foreign footprint.  The Company completed 6 additional acquisitions in the U.K., and by the end of Q2 2015, the Company had over 45 facilities across the U.K.

70. In February 2016, the Company completed its acquisition of Priory, then the largest independent provider of behavioral healthcare services in the U.K., for roughly $2.2 billion.

71. As the Company was becoming more dependent on its U.K. facilities and expansion, those same facilities were becoming the subject of increasing scrutiny by U.K. media outlets for Acadia's poor patient safety and care.

**B.  The Individual Defendants Facilitate the Operation of Unsafe Facilities with Disastrous Consequences for Patients**

72. As discussed in more detail below, the Individual Defendants routinely boasted about the supposed high-quality patient care the Company delivered in its Forms 10-K, 10-Q, and 8-K at all relevant times. For example, in its "Overview" section," the Company stated, "We strive to improve the operating results of our facilities by," among other things, "***providing high-quality services***."

73. But under the Individual Defendants' stewardship, Acadia has employed a business strategy that prioritizes profits over patient safety and well-being. Acadia sought to increase beds while at the same time dramatically reducing staffing expenditures, the Company's single largest expense. This strategy has had disastrous consequences for Acadia's patients' health and safety.

**1.  Sexual Abuse**

74. According to a lawsuit filed in 2017 against the Rolling Hills Hospital, one patient was repeated sexually assaulted by another resident from 2014 to 2015. The lawsuit alleged that despite Acadia having knowledge of the sexual assaults and other assaults against patients, the hospital failed to report them to police. In July 2015, after an investigation was conducted, all children under the supervision of the Oklahoma Department of Human Services were removed from the Rolling Hills Hospital.

75.     Likewise, the Company's failure to protect patients at its Timberline Knolls facility in Lemont, Illinois subjected Acadia to two lawsuits in 2017.  One lawsuit alleges the wrongful death of patient Grace Cho due to patient neglect.  In the other lawsuit, Michael Jacksa, formerly a licensed therapist at Timberline Knolls, was charged with sexually assaulting a female patient during therapy sessions at Timberline Knolls.  In connection with that lawsuit, several former Timberline patients also came forward to the Lemont Police Department.  The police's investigation reports include accounts of sexual abuse ranging from inappropriate comments to forced oral sex and rape of multiple women during one-on-one counseling sessions, some of which were held in a locked luggage room for which only Jacksa had a key, occurring between December 2017 and June 2018.

76.     In July 2013, three female patients of Acadia's Park Royal Hospital in Fort Meyers, Florida reported having been sexually assaulted by a staff member at the facility, Benjamin Bland. The patients reported having been sexually assaulted in a bathroom, closet, and in their room. Following the initial three women's reports against Bland, eight additional women came forward also alleging sexual abuse by bland.  Police investigations revealed that while Bland had claimed to be a licensed certified nursing assistant who worked as a home health aide, Bland was never employed as a home health aide and the Park Royal Hospital had never corroborated his work experience through his reference.  Bland also had an arrest history, including having been arrested for battery when Bland choked his girlfriend.

77.     According to KOB4 Eyewitness News out of Albuquerque, New Mexico, multiple lawsuits filed in March 2019 against Acadia's Desert Hills facility located in Albuquerque (now permanently closed) allege that the children within the facility were abused, young girls beaten up,

and staff was having sex with teenaged patients. These abuses were directly linked to "a problem of understaffing, a problem taking often times children they have no business taking."

### 2. Physical Abuse and Suicides

78. According to a November 10, 2018 article in *The Daily Mail*, Acadia's facilities were deplorable. The article revealed patient abuses at several of the Company's facilities, explaining that "hundreds of people with autism and learning disabilities are being routinely abused in some facilities, confined in horrific seclusion cells, fed through hatches like animals, aggressively restrained and forcibly drugged."

79. Government investigations and lawsuits against the Company concerning its Rolling Hills Hospital located in Ada, Oklahoma highlight conditions of neglect and failure to protect patients from abuse. According to a complaint filed in the District Court of Canadian County State of Oklahoma, Shannon Archer was admitted to the Rolling Hills Hospital for alcoholism. Ms. Archer suffered permanent brain damage, however, when a patient attacked her from behind and smashed her head onto the concrete floor. Because the hospital was so severely understaffed, however, no supervisory staff were present to assist her.

80. In a similar vein, a state inspection report cited Acadia's Montana Treatment Center located in Butte, Montana for failing to provide a safe environment for its staff and patients. The report emphasized that the facility had 132 patient assaults and 38 incidents of residents causing property damage over a 13-week review period. The Montana Treatment Center has also been cited by the state for reports that staff was watching pornography while on the premises, residents being pushed to the floor and attacked by staff, 128 patient assaults, and 26 incidents of property damage.

81. Detroit's WXYZ-TV Channel 7 also investigated Acadia's Harbor Oaks Hospital located in New Baltimore, Michigan, revealing "a pattern of assaults on staff dating back years,

repeated allegations of physical and sexual abuse involving patients and cries for help that former employees say went ignored." Former employees stated that "We don't have enough staff . . . to deal with what we have" and asserted that "[Acadia] would rather have more money than [] make sure their staff was safe." The Harbor Oaks Hospital was so understaffed that it was fined $13,500 by the Occupational Safety and Health Administration for not providing a safe work environment.

82. Aurelius Value conducted its own investigation, reviewing over 600 state and federal inspection reports, court records, media reports, lawsuits, and police records. It found that several patients had died due to alleged negligence or patient malpractice while at Acadia's facilities, rampant reports of sexual and physical assaults perpetrated by Acadia employees and other unmonitored patients, and numerous instances of patient neglect linked directly to staffing problems at Acadia facilities.

83. Acadia's Park Royal Hospital, discussed above, was in "Immediate Jeopardy" in 2014 following a patient suicide resulting from lack of supervision. The hospital admitted the patient and placed the patient on 15-minute check-ins; however, none were made from 9:00 to 9:30. Hospital video footage shows the patient walking down the hallway with a patient gown to his room, where he hanged himself using the gown.

84. The same year, Acadia's Red River Hospital located in Wichita Falls, Texas had its Medicare funding terminated after receiving citations for numerous deficiencies that led to a patient's death. Specifically, the report stated that the hospital's practices "[c]reated an Immediate Jeopardy situation resulting in the death of patient No. 6, and the likelihood of serious harm, injury, impairment, or death to all patients receiving care at this hospital."

85. In 2016, at the Sonora Behavioral Health Hospital located in Tucson, Arizona, acquired by Acadia in 2012, a patient who was under mandatory five-minute check-ins was found

hanging in her room. The patient had been admitted to the hospital as being at high risk of self-harm, among other things, and under mandatory check-ins every fifteen minutes, but within four hours after admittance, the patient was escalated to five-minute check-ins. The next morning following the patient's admittance, no checks were made between 7:50 a.m. and 8:50 a.m., and the patient was found hanging from her bathroom doorframe.

86.     On January 22, 2017, *The Times* published an article entitled "Deaths Spark Care Fears at Priory Hospitals." According to that article "[c]oroners have issued five formal notices over the past five years highlighting care failures after deaths of patients" at Priory hospitals and cited the hospitals' "failure adequately to monitor patients at risk of self-harm" as among the recurring problems for the "prevention of future death notices." Further, "[t]hey are the latest in a series of incidents that has raised concerns about the welfare of patients, both private and NHS, at Priory hospitals."

87.     Numerous media outlets, including *The Guardian*, *BBC News*, and *The Times*, reported on the quality report on the Priory Hospital Roehampton published by the independent regulator, Care Quality Commission ("CQC"), which, according to *The Times*, found the hospital's safety was "inadequate" after "scrutiny since a series of patient suicides and self-harming incidents." Specifically, "[c]oncerns were by the [CQC] about unsafe staffing levels and bosses have received an official warning notice."

88.     On May 2, 2017, *BBC News* published an article entitled "Priory's Care Plan for Anorexic Teen . . . 'inadequate'." *BBC News* reported that the "jury returned a conclusion of suicide but found the care plan . . . was inadequate and there was not enough communication with the family about her suicide risk."

**C.** **The Individual Defendants Misleadingly Touted the High Quality of Care at Acadia's Facilities**

89.     Despite the grave issues of sexual and physical abuse, directly linked to understaffing, plaguing the Company, the Individual Defendants routinely boasted the Company's high-quality care provided to its patients.

90.     In the Company's Forms 10-K and Forms 10-Q, the Company consistently described its services as "high-quality" and a key factor in improving its operating results: "Our business strategy is to acquire and develop inpatient behavioral healthcare facilities and improve our operating results . . . . *We strive to improve the operating results of our facilities by providing high quality services . . . .* "  This statement, or materially similar statement, appeared in the Company's Forms 10-K for FY 2014, filed on February 27, 2015; FY 2015, filed on February 26, 2016; FY 2016, filed on February 24, 2017; and FY 2017, filed on February 27, 2018.  This statement, or materially similar statement, was also included in the Company's Forms 10-Q for: Q1 2014, filed on April 30, 2014; Q2 2014, filed on July 30, 2014; Q3 2014, filed on October 30, 2014; Q1 2015, filed on April 29, 2015; Q2 2015, filed on August 5, 2015; Q3 2015, filed on November 4, 2015; Q1 2016, filed on April 29, 2016; Q2 2016, filed on July 29, 2016; Q3 2016, filed on November 2, 2016; Q1 2017, filed on April 26, 2017; Q2 2017, filed on July 28, 2017; Q3 2017, filed on October 25, 2017; Q1 2018, filed on May 3, 2018; Q2 2018, filed on July 31, 2018; Q3 2018, filed on November 6, 2018; and Q1 2019, filed on May 1, 2019.

91.     The Company further represented to investors that its strategic acquisitions emphasized quality of service as well: "We leverage our management team's expertise to identify and integrate acquisitions based on a *disciplined acquisition strategy that focuses on quality of service . . . .*"  This statement was included in the Company's Forms 10-K for: FY 2013, filed on February 21, 2014; FY 2014, filed on February 27, 2015; FY 2015, filed on February 26, 2016;

FY 2016, filed on February 24, 2017; FY 2017, filed on February 27, 2018; and FY 2018, filed on March 1, 2019.

92.     The Company's Forms 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") certifying that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading," or other materially similar language, as follows: by defendants Jacobs and Duckworth: 2014 10-K; 2015 10-K; 2016 10-K; and the 2017 10-K.  The Company's Form 2018 10-K contained the same or materially similar signed certifications pursuant to SOX by defendant Duckworth and nondefendant Osteen.  The Company's Forms 10-K were also signed by certain of the Director Defendants as follows: by defendants Jacobs, Duckworth, Bissell, Gordon, Grieco, Miquelon, Petrie, Rogers, Waud for FYs 2014 and 2015; by defendants Jacobs, Duckworth, Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, Rogers, and Waud for FYs 2016 and 2017; and by defendants Jacobs, Duckworth, Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud for FY 2018.

93.     The Company's Forms 10-Q contained signed certifications pursuant to SOX certifying that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading," or other materially similar language, as follows: by defendants Jacobs and Duckworth: Q1, Q2, Q3 2014; Q1, Q2, Q3 2015; Q1, Q2, Q3 2016; Q1, Q2, Q3 2017; and Q1, Q2, Q3 2018.  The Company's Form 10-Q for Q1 2019 contained the same or materially similar signed certifications pursuant to SOX by defendant Duckworth and nondefendant Osteen.

94.     Consistent with the misrepresentations in the Company's Forms 10-K and 10-Q, the same falsehoods were repeatedly expressed on calls and at meetings with analysts and investors.  For example, on May 12, 2015, defendants Jacobs and Turner gave a presentation to investors, analysts, and market participants at the Bank of America Merrill Lynch Health Care Conference on behalf of Acadia.  Defendant Jacobs stated: "This is our secret to success, these green boxes, these division structures.  The accountability, responsibility, the freedom we give those division presidents and those local CEOs of our company, putting in that our clinical departments, *our oversight of the quality, just absolutely is the secret to our success*.  Absolutely the secret to our success."

95.     In addition, in the Company's Proxy Statement filed on Schedule 14A with the SEC on April 8, 2016, the Board opposed a stockholder proposal requesting the Company prepare a sustainability report describing the Company's environmental, social, and governance risks and opportunities, including patient and worker safety, claiming that the Company "conduct[s] [its] business in compliance with applicable law including environmental, health and safety regulations, and we work hard to be an exceptional employer, a good neighbor and a good citizen."  The Board instead suggested resources be focused on the "core elements" of the Company's business strategy, which included:

- creating a world-class organization that sets the standard of excellence in the treatment of specialty behavioral health and addiction disorders;

- creating behavioral health centers where people receive individualized and quality care that enables them to regain hope in a supportive, caring environment;

- offering an enviable internal culture and environment that encourages and supports both professional and personal growth that our employees are proud of; and

- developing partnerships with physicians, professionals, and payers within the communities we serve through the delivery of high quality specialty

34

behavioral health services at affordable costs while always putting the patient first.

96.     The Company's statements regarding the purportedly high quality of care provided at Acadia's facilities were materially false and misleading or omitted material information necessary to make them not misleading because: (i) Acadia did not "strive to improve the operating results of [its] facilities by providing high quality services," but rather focused on a growth strategy driven by bed expansion and cutting costs at the expense of adequately staffing and servicing the Company's existing facilities; (ii) Acadia did not recruit, hire, or maintain staff sufficient to comply with basic safety standards; (iii) due to severe understaffing, Acadia was providing deplorable care to its patients, resulting in patient neglect and rampant sexual and physical abuse, even death; (iv) the Individual Defendants failed to maintain adequate internal controls or corporate oversight; and (v) as a result of the foregoing, the Company's SOX certifications and the Forms 10-K and 10-Q containing the Company's SOX certifications were also false and misleading.

**D.    The Individual Defendants Misled the Investing Public Regarding the Company's Staffing of Its Facilities**

97.     Notwithstanding the numerous documented incidents of abuse and neglect occurring at Acadia's facilities, which were directly attributable to understaffing, the Individual Defendants consistently maintained that Acadia appropriately staffed its facilities to provide high quality care to its patients. In reality, however, Acadia was deliberately understaffing its facilities at the expense of patient care in order to cut costs.

98.     On June 9, 2016, defendants Jacobs and Turner presented to investors, analysts and market participants at the Jefferies Healthcare Conference on behalf of Acadia, where Jacobs made similar statements on Acadia's staffing efforts:

35

**[Brian Tanquilut – Jefferies Analyst:]** Joey, one of the things that we have heard is – we are hearing some constraints on the clinician front in terms of hiring and capacity. So, as you are growing your beds, what do you see in terms of the challenges or the ability to bring in whether it is a psychiatrist or psychologist or nurses?

**[Jacobs:]** Okay. We, probably two years ago, invested heavily into our internal recruitment department at the corporate office, primarily focused on psychiatrists, *and we have been very efficient and very fortunate in being able to always be able to find the psychiatrist that we need to make sure we can handle the growth in our bed build*. So psychiatrists to us, sure, we might have a single facility that might have an issue, but overall for the Company, this has not been an issue.

99.     Likewise, during a July 29, 2016 earnings call, when asked again about "clinician supply," defendant Jacobs stated "*we're able to find the clinicians we need, and that has not been an issue to us growing*." Defendant Jacobs continued: "*So we're very pleased that consistently in the history of Acadia, that we've been able to build the appropriate number of beds each year, and find the clinicians to staff those beds, and to meet the needs of these local communities.*"

100.    Indeed, during a November 2, 2016 earnings call to discuss the Company's Q3 2016 financial results, defendant Jacobs expressly disclaimed that staffing issues had any effect on Acadia's growth rate: "*The softness in our same-facility volumes in the third quarter was affected by a handful of our facilities and was not the result of any material labor shortages. While we have a few markets that have labor challenges, this is not materially affecting our growth rate. . . . These numbers clearly demonstrate that Acadia has the ability to recruit psychiatrists where needed.*"

101.    On March 7, 2017, during the Raymond James Institutional Investors Conference, defendant Jacobs presented to investors and analysts on behalf of Acadia, expressly stating: "And there are a lot of people, and enough so far, want to be in the mental health area, that they want to serve their community this type of care. *So so far today we have enough of those individuals to meet the needs.*"

102.     On May 16, 2018, Jacobs and Turner presented to investors, analysts, and market participants at the Bank of America Merrill Lynch Health Care Conference on behalf of Acadia, where Turner was questioned about the difference in labor challenges between Acadia's U.S. and U.K. business operations:

> **[Kevin Marx Fischbeck – BofA Merrill Lynch Analyst:]** And I guess, maybe moving back to the U.S. It's really interesting how, I guess, in the U.K. you've had a harder – you've hit harder by the labor side and UHS wasn't. And then in the U.S., UHS was being hit harder by the labor side than you were. I mean, how do you think about the labor rates? And is that a gating factor at all to kind of how you think about growth?
>
> **[Turner:]** . . . . ***We've been very fortunate in the U.S. to have, with the exception of maybe a few markets, to really have been able to not just maintain our staffing, right?*** We're increasing staffing because of the volume increases, the bed additions, and we've been able to do that within our 2% to 3% merit increases. So I was speaking with a group earlier in a meeting, and we're having to work harder to do that. We've got to expand our corporate recruiting for talent in the field. It's a much bigger department than it used to be and it's much more dedicated and concentrated. But they are helping our facilities recruit and our benefit plans from our HR departments are competitive. And so we just have to kind of continue to be a preferred employer, be a good place for these people to work because they have a commitment to behavioral health. And so if we're going to be a market leader, we're going to continue to hopefully be a preferred employer in those markets. But having said that, it's full employment data across the country. ***So it's not easy, but we're making it work.***

103.     The Company's statements regarding the staffing at its facilities were materially false and misleading because: (i) the majority of Acadia's acute inpatient facilities were not appropriately staffed. Indeed, according to an October 2018 analysis of CMS inspection reports from 2013 to 2018, 28 of the 31 acute inpatient U.S. hospitals listed on Acadia's website had staffing deficiencies, including consistent failures to staff facilities with enough nurses and practitioners; and (ii) Acadia's systemic staffing did not "meet the needs" of its patients or the local communities Acadia serves; rather, it allowed for unsafe patient conditions and resulted in numerous reports of patient abuse and neglect.

### E. The Individual Defendants Misled the Market Regarding Acadia's Compliance with Applicable Law

104. The Individual Defendants repeatedly emphasized Acadia's compliance with applicable regulatory requirements, when, in reality, its facilities were regularly in violation of CMS and state regulations regarding patient/staff ratios.

105. In the Company's Forms 10-K, signed by defendants Jacobs and Duckworth, the Company consistently maintained that "***Management believes we are in substantial compliance with all applicable laws and regulations and is not aware of any material pending or threatened investigations involving allegations of wrongdoing.***" This statement, or other materially similar statement, was included in the Company's Forms 10-K for: FY 2014, filed on February 27, 2015; FY 2015, filed on February 26, 2016; FY 2016, filed on February 24, 2017; and FY 2017, filed on February 27, 2018.

106. On June 9, 2017, Acadia filed a Form S-3ASR registration statement and prospectus with the SEC, which incorporated by reference the above-referenced statement.

107. On August 18, 2017, Acadia filed with the SEC a Form 424B7 prospectus supplement to the June 9, 2017 prospectus for a follow-on offering of Acadia common stock, which incorporated the same.

108. The Company's statements regarding compliance with applicable laws and regulations were materially false and misleading or omitted material information necessary to make them not misleading because as revealed by Aurelius Value's October 2018 investigation, CMS inspection reports found staffing deficiencies at 28 of the 31 publicly-listed Acadia hospitals on Acadia's website, and of the 28 hospitals with staffing deficiencies, 25 were also cited for deficiencies concerning patient safety or care, including patient deaths, suicides, escapes, improper

use of restraints, and physical and sexual assaults, and as a result of the foregoing, the SOX

certifications for the Company's consolidated Forms 10-K were false and misleading.

F.    **The Individual Defendants Made a Series of False and Misleading Statements Regarding the Company's U.K. Business and Performance**

109.    On February 23, 2017, Acadia issued a press release announcing the Company's

financial and operating results for the fourth quarter and fiscal year ended December 31, 2016 (the

"FY 2016 Press Release"). For the fourth quarter, Acadia reported revenues of $702.9 million,

compared to $495.3 million for the same period in the prior year, an increase of 41.9%, and net

income of $41.8 million compared to $34.5 million for the fourth fiscal quarter of 2015, an increase

of 21.1%. Defendant Jacobs claimed that the Company "produced very strong growth in revenue

and adjusted EBITDA" fueled by the acquisition of Priory. In the FY 2016 Press Release,

defendant Jacobs stated:

> The Priory acquisition drove the majority of our revenue growth for 2016, as we gained nearly 6,200 net additional beds in the U.K. due to the combined effect of the acquisition and the subsequent facility sale. These beds represented a majority of the 71.7%, or over 7,100 bed, increase in total beds at the end of 2016 from the end of 2015. This increase includes 967 new beds added to existing or de novo facilities during the year, consisting of 827 beds to existing facilities and 140 beds to de novo facilities. During the fourth quarter, 279 new beds were added to existing facilities, and we expect to add more than 800 new beds during 2017, primarily to existing facilities.
>
> . . . . Same facility revenue in the U.K. grew 4.2%, on a 4.7% increase in patient days offset by a 0.5% decrease in revenue per patient day. Management believes that same facility results in the U.K. reflected disruption throughout the fourth quarter resulting from the focus, time and effort required to complete the divestiture in late November and to begin the integration of Priory's operations into Acadia.

110.    The FY 2016 Press Release also included Acadia's financial guidance for fiscal

year 2017 and the first fiscal quarter of 2017:

- Revenue for 2017 in a range of $2.85 billion to $2.9 billion;

- Adjusted EBITDA for 2017 in a range of $625 million to $640 million;

- Adjusted earnings per diluted share for 2017 in a range $2.40 to $2.50; and

- Adjusted earnings per diluted share for the first quarter of 2017 in a range of $0.45 to $0.47.

111. On February 24, 2017, Acadia filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 Form 10-K") with the SEC, reaffirming the Company's FY 2016 Press Release. The 2016 Form 10-K described Acadia as "the leading independent provider of mental health services in the U.K." and made a series of positive representations about the Company's U.K. operations. For example, the 2016 Form 10-K discussed "favorable industry and legislative trends" and represented that the quality of the Company's U.K. operations gave it a "competitive strength" in the market:

> The mental health hospitals market in the U.K. was estimated at £15.9 billion for 2014/2015. As a result of government budget constraints and an increased focus on quality, ***the independent mental health hospitals market has witnessed significant expansion in the last decade***, making it one of the fastest growing sectors in the U.K. healthcare industry. ***Demand for independent sector beds has grown significantly*** as a result of the National Health Service (the "NHS") reducing its bed capacity and increasing hospitalization rates. Independent sector demand is expected to further increase in light of additional bed closures and reduction in community capacity by the NHS.

> \*       \*       \*

> The U.K. Department of Health recently identified priorities for essential change in mental health that include, among other things, funding providers based on the ***quality of their service rather than volume of patients***, allocating funds to support specialized housing for people with mental health problems and adopting a new rating system and inspection process to improve the quality of care. Increasing political focus on the provision of mental health services in the U.K. and increasing support for the rights of mental health patients are expected to lead to further increases in the size of the mental health market in the U.K. In addition, rising demand for mental health services in the U.K. coupled with a constrained mental healthcare funding environment are increasing pressure to improve operational efficiency and refer patients to single provider programs with care pathways that more appropriately reflect each patient's specific mental health needs. As a result of these pressures and an increased focus on quality, ***the independent mental health market has witnessed significant expansion in the last decade, making it one of the fastest growing sectors in the U.K. healthcare industry***.

112.    The 2016 Form 10-K was signed by defendants Jacobs, Duckworth, Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, Rogers, and Waud.  The 2016 Form 10-K contained signed certifications pursuant to SOX by defendants Jacobs and Duckworth, certifying that the financial information included in the 2016 Form 10-K was accurate and disclosed any material changes in the Company's internal control over financial reporting.

113.    On April 25, 2017, Acadia issued a press release, announcing the Company's financial and operating results for the first fiscal quarter ended March 31, 2017 (the "April 25, 2017 Press Release").  For the first quarter, Acadia reported revenues of $679.2 million, compared to $616.8 million for the same period in the prior year, an increase of 10.1%, and net income of $35 million, compared to $25.7 million for the first fiscal quarter of 2016, an increase of 36.1%. Net income from continuing operations attributable to Acadia stockholders per diluted share increased 29% to $0.40 for the first fiscal quarter 2017 from $0.31 for 2016 for the same quarter. In the April 25, 2017 Press Release, defendant Jacobs boasted that the Company's revenue growth was attributable to the acquisition of Priory and Acadia's U.K. operations, stating:

> Our revenue growth primarily resulted from the acquisition of Priory Group on February 16, 2016, which added approximately 6,200 beds, net of the divestiture, to our operations in the United Kingdom.  In the trailing 12 months ended March 31, 2017, we also acquired nearly 240 beds through three transactions and added 719 beds to existing facilities and de novo facilities, 82 of which were added to existing facilities in the first quarter of 2017.

> The favorable impact of the growth in our beds in operation during the first quarter was partially offset by a reduction of approximately six percentage points in our revenue growth rate due to the post-Brexit decline in the exchange rate of the British Pound Sterling to the U.S. dollar, in addition to the impact of the first quarter of 2017 having one less day due to leap year in 2016.

> . . . .  Same facility revenues increased 2.6% for the U.K. facilities, with a 0.1% increase in patient days and a 2.4% increase in revenue per patient day.  Total same facility EBITDA margin declined to 25.2% for the first quarter of 2017 from 25.6% for the first quarter of 2016.  Acadia's consolidated adjusted EBITDA was $136.4 million for the first quarter of 2017, up 4.1% from $131.0 million for the first quarter of 2016.

41

114. The April 25, 2017 Press Release also reaffirmed the Company's previously announced 2017 financial guidance, stating:

- Revenue for 2017 in a range of $2.85 billion to $2.9 billion;

- Adjusted EBITDA for 2017 in a range of $625 million to $640 million; and

- Adjusted earnings per diluted share for 2017 in a range $2.40 to $2.50.

115. On April 26, 2017, Acadia filed its Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the first fiscal quarter ended March 31, 2017 (the "Q1 2017 Form 10-Q"). In the Q1 2017 Form 10-Q, Acadia reaffirmed the Company's statements about its financial results contained in the April 25, 2017 Press Release and continued to tout the Company's U.K. operational expansion, including the acquisition of Priory. The Q1 2017 Form 10-Q was signed by defendant Duckworth and contained signed SOX certifications by defendants Jacobs and Duckworth attesting to the accuracy of the statements contained in the financial report and the disclosure of any material changes in the Company's internal control over financial reporting.

116. On June 9, 2017, Acadia filed a registration statement on Form S-3 and prospectus for a "shelf" registration, *i.e.*, a continuous offering process (the "2017 Form S-3"). The 2017 Form S-3 incorporated by reference the 2016 Form 10-K, the Q1 2017 Form 10-Q, and Current Reports on Forms 8-K filed May 10, 2017 and May 25, 2017, including the improper statements concerning the Company's financial condition and U.K. operations contained therein.

117. On July 27, 2017, Acadia issued a press release reporting the Company's financial and operating results for the second fiscal quarter ended June 30, 2017 (the "July 27, 2017 Press Release"). For the second fiscal quarter, Acadia reported revenues of $715.9 million, compared to $756.5 million for the same period in the prior year, a decrease of 5.4%, and net income of $49.6 million, compared to $56.4 million for same period in the prior year. The Company reported

net income from continuing operations attributable to Acadia stockholders of $0.57 per diluted share for the first fiscal quarter 2017, compared to $0.65 per diluted share for the same period in the prior quarter. In the July 27, 2017 Press Release, defendant Jacobs touted the Company's U.K. operations, emphasizing that "U.K. same facility revenues increased 4.0%, on growth of 2.8% and 1.1% in patient days and revenue per patient day, respectively." Defendant Jacobs further stated:

> Our second quarter financial results were consistent with our expectations for the quarter and financial guidance for the year. We achieved improved same facility revenue performance, with growth of 6.5% for the quarter on an increase of 4.6% in patient days and 1.8% in revenue per patient day. We were especially pleased with our same facility revenue growth for our U.S. facilities, which increased 7.8% for the second quarter, on an increase of 6.0% in patient days and 1.7% in revenue per patient day, while U.K. same facility revenues increased 4.0%, on growth of 2.8% and 1.1% in patient days and revenue per patient day, respectively.

> Our growth in same facility revenue for the second quarter resulted, in part, from the addition of 625 new beds to existing facilities in the 12 months ended June 30, 2017. During the second quarter, 91 new beds were added to existing facilities, and we expect to add approximately 800 new beds to existing facilities and three de novo facilities in 2017.

118. In the July 27, 2017 Press Release, the Company also disclosed that it had narrowed its previously reported financial guidance for fiscal year 2017. Specifically, the Company narrowed its Adjusted EBITDA guidance for 2017 to be in the range of $628 million to $635 million, from its previously announced range of $625 million to $640 million, and narrowed its earnings guidance to be in the range of $2.42 to $2.47 per diluted share, from its previously announced range of $2.40 to $2.50 per diluted share.

119. On July 28, 2017, Acadia filed its Quarterly Report on Form 10-Q for the second fiscal quarter ended June 30, 2017 (the "Q2 2017 Form 10-Q"), reiterating the financial and operating results previously announced in the July 27, 2017 Press Release. The Company again touted its U.K. operational expansion, including the acquisition of Priory. The Q2 2017 Form 10-Q was signed by defendant Duckworth and contained signed SOX certifications by defendants

Jacobs and Duckworth attesting to the accuracy of the statements contained in the financial report and the disclosure of any material changes in the Company's internal control over financial reporting.

120.   On August 16, 2017, Acadia filed a prospectus supplement to the 2017 Form S-3 with the SEC, (the "2017 Prospectus Supplement"), pursuant to which certain Company insiders, including defendants Jacobs, Turner, and Waud, and certain related entities, sold over 1.5 million shares of Acadia securities to Citigroup, Inc., which then sold these shares to the public. The offering priced Acadia shares at $50.69 per share and generated proceeds of over $76 million. The 2017 Prospectus Supplement incorporated by reference Acadia's 2016 Form 10-K, Q1 2017 Form 10-Q, and Q2 2017 Form 10-Q which contained improper statements concerning Acadia's financial condition and the Company's U.K. operations and growth prospects.

121.   The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that:

  a.    the Company's U.K. operations did not provide the "competitive strength" driving supposed growth and profitability;

  b.    the Company failed to maintain adequate disclosure controls and procedures with respect to Acadia's operations; and

  c.    as a result of the foregoing, the Company's officers' and directors' representations concerning Acadia's business, prospects, and financial condition were improper.

**G.    The Individual Defendants Continued to Mislead the Market Regarding Acadia's U.K. Business Segment, Despite the Truth of Its Struggling Operations Beginning to Emerge**

122.   Despite Acadia's routinely optimistic forecasts, on October 24, 2017, the Company issued a press release disclosing that its U.K. facilities were struggling (the "October 24, 2017 Press Release"). Citing a lower census, increased operating costs, "seasonal softness," and a

44

tightening labor market, the Company announced that its U.K. facilities operating results fell significantly below the forecasts Acadia's fiduciaries had assured investors would be met. The press release also revealed that the Company had lowered its 2017 earnings guidance to be in the range of $2.23 to $2.25 per diluted share from its recently reaffirmed guidance of $2.42 to $2.47 per diluted share and reduced adjusted EBITDA from a range of $600 million to $605 million from a range of $628 million to $635 million. In particular, the October 24, 2017 Press Release stated:

> The third quarter financial results for our operations in the United Kingdom reflected a lower census and higher operating costs than anticipated. After experiencing expected seasonal softness in census for the month of August, the typical rebound in census in the month of September was significantly weaker than anticipated. In addition, due to further tightening in the labor market primarily for nurses and other clinical staff, we incurred higher agency labor expense than planned. Same facility revenue increased 3.8% for the quarter, with a 2.5% increase in patient days and a 1.2% increase in revenue per patient day. U.K. same facility EBITDA margin was 21.4% for the quarter compared with 22.6% for the third quarter last year. Total facility EBITDA margin in the U.K. declined 170 basis points to 19.3% for the third quarter of 2017.

123. The following day, on October 25, 2017, the Company held an earnings call with analysts and investors to discuss Acadia's third quarter 2017 financial and operating results. During that call Defendant Jacobs further discussed the challenges facing Acadia in the U.K. In discussing the tightening labor market in the U.K., defendant Jacobs stated:

> The second issue is one we've discussed on these calls before, although it had more of an impact on our financial results this quarter compared to previous quarters. **_Due to the tightening labor market in the U.K. for nurses and other clinical staff_**, we saw higher labor expense than expected, which unfavorably impacted EPS by $0.05. We believe that uncertainty around Brexit is deterring healthcare workers from coming into the U.K. Therefore, we are having to rely more on agency labor to fill our open positions. We expect our costs to rise in August as our employees take vacations, but it was compounded as we had to fill vacant positions with agency labor. Labor costs continued to increase in September and we believe this trend will continue for the remainder of the year.

\*     \*     \*

45

So there's a lot of things going on in the U.K. that we're working on around labor costs and revenue. And hopefully we'll start seeing that, but it will be a longer process in the U.K. than it is here in the U.S. But if we'll take one step at a time, hopefully by the end of the year we're in a much, much better position than we are today both on revenue and on managing the labor costs.

124. During the conference call, defendant Jacobs reiterated that the earnings shortfall in the U.K. was due to lower census and higher operating costs. Defendant Jacobs, however, reassured investors and analysts that these were short-term issues:

Let me begin with the discussion of the results for our U.K. operations, which produced same facility revenue growth of 3.8% for the quarter and 2.4% total revenue growth. In addition, same facility EBITDA margin declined 120 basis points to 21.4%. In total, EBITDA margin fell 170 basis points to 19.3%. The results in the U.K. were significantly below our expectation.

We faced 2 unexpected issues in the U.K. that are primarily accountable for a $0.09 unfavorable impact on EPS. The first is that *the normal seasonality affecting census in the U.K. did not occur as expected for the third quarter.* The typical seasonal rebound in business in September was much weaker than historical experience led us to expect. Occupancy for the third quarter was just below 87% compared to our expectation of additional growth in occupancy of 89% to 90%. As a result, we believe the lower occupancy had a $0.04 impact to earnings per share. *Additionally, census in the U.K. still has not recovered thus far in October and this is reflected in our updated guidance.*

We continue to analyze and closely monitor the issue. *We see no reason to believe this is anything other than a short-term issue*, but we have little visibility into the timing for a rebound to normal census level, which factors into our decision to reduce our 2017 financial guidance. Because we are confident in the long-term demand trends, we are continuing our new bed expansion as scheduled with 42 expected beds in the fourth quarter.

The second issue is one we've discussed on these calls before, although it had more of an impact on our financial results this quarter compared to previous quarters. *Due to the tightening labor market in the U.K. for nurses and other clinical staff, we saw higher labor expense than expected, which unfavorably impacted EPS by $0.05.* We believe that uncertainty around Brexit is deterring healthcare workers from coming into the U.K. Therefore, we are having to rely more on agency labor to fill our open positions. We expect our costs to rise in August as our employees take vacations, but it was compounded as we had to fill vacant positions with agency labor. Labor costs continued to increase in September and we believe this trend will continue for the remainder of the year.

125. Not surprisingly, despite defendant Jacobs' attempts to reassure the market these were short-term issues, when news of the Company's disappointing and unexpected financial results and significantly lowered financial guidance reached the market, Acadia's stock price fell $11.44 per share, or nearly 26%, to close at $32.68 per share on October 25, 2017, compared to the previous trading day's closing of $44.12 per share, erasing more than *$1 billion* in market capitalization in a single day. However, the price of Acadia stock remained artificially inflated, and the full extent of the Individual Defendants' misstatements about the performance of the Company's U.K. operations continued to remain hidden from the public.

126. On February 21, 2018, after the market closed, the Company issued a press release announcing its financial and operating results for the fourth quarter and fiscal year ended December 31, 2017. The press release stated:

> Same facility revenue for Acadia's U.K. operations increased 3.7% for the fourth quarter of 2017 compared with the fourth quarter of 2016, with a 1.5% increase in patient days and a 2.2% increase in revenue per patient day. U.K. same facility EBITDA margin was 21.1% for the fourth quarter compared with 22.3% for the fourth quarter of 2016. Mr. Jacobs added, "The fourth quarter results for our operations in the U.K. met our revised expectations. Our results still reflect a lower census than normal and continued pressure from higher agency labor expense, primarily for nurses and other clinical staff, due to tightening in the U.K. labor market."

127. The following day, on February 22, 2018, the Company held an earnings conference call with analysts and investors to discuss Acadia's previously announced financial and operating results for the fourth quarter and fiscal year ended December 31, 2017. During the conference call, defendant Jacobs touted the Company's fourth quarter results and made positive statements about the long-term outlook for Acadia's U.K. operations. Defendant Jacobs stated:

> We are pleased with the overall performance for the fourth quarter. Our results met or exceeded our revised expectations. Total same facility revenue for the fourth quarter of 2017 increased 5.6% as compared to the fourth quarter of 2016. U.S. same facility revenue for the quarter increased 6.6% from the fourth quarter of

2016.  U.K. same facility revenue for the quarter increased 3.7% from the fourth quarter of 2016.

*     *     *

We have entered 2018 optimistic about our prospects for growth during the year. We remain focused on the U.K. operations.  In the short term, we are working to mitigate the impact of a rollout to Italy, weak rebound in census in the latter month of 2017 and the increased cost of agency labor.

Longer term, we expect to manage through both of these issues by investing in initiatives to drive increased census, recruit additional nurses and clinical staff, improve our real-time labor management and negotiate appropriate reimbursement for the care we provide.

We have implemented several initiatives to help manage our agency labor, including a new reporting tool.  Facilities are now required to track their agency hours on a daily basis.  With the help from these initiatives, we are starting to see improvement in our agency labor.  In January, agency expense as a percent of total labor declined to 11.4% from 12% in December.  We expect this improvement to continue throughout 2018.  As a percentage of revenue, total labor cost, including agency labor, are expected to decline from 65% in the fourth quarter of 2017 to less than 64% for 2018.

We would also like to provide some guidelines for our same facility metrics in 2018.  We expect same facility revenue to grow in the mid-single digits.  Same facility EBITDA margins are expected the same or slightly up.  Despite some expected challenges in 2018, favorable dynamics related to demand and capacity, access and parity continue to support the growth potential of behavioral health care in the U.S. and the U.K. markets.  We believe Acadia is well positioned to leverage these dynamics to create further long-term growth in our earnings and shareholder value.

128.    On May 1, 2018, after the market closed, the Company issued a press release announcing its financial and operating results for the first quarter ended March 31, 2018.  The press release contained positive assertions about the Company's U.K. operations, and highlighted that "[Acadia's] U.K. operations produced a rebound in same facility revenue for the quarter, both of which led to improved same facility margin.  This growth was supported by 57 beds added to existing facilities during the first quarter.  We also opened a new 64-bed facility, bringing total

beds added for the quarter to 121. We continue to plan the addition of more than 800 beds to existing and new facilities during 2018."

129.    On May 2, 2018, the Company held an earnings conference call with analysts and investors to discuss Acadia's previously announced financial and operating results for the first quarter ended March 31, 2018. During the call, defendant Jacobs touted the Company's revenue growth in the U.K. and noted that "[s]ame facility EBITDA margin for [Acadia's] UK operations increased 30 basis points to 20.3%." After Acadia's executives opening remarks, the Company opened the line up to questions from analysts. During this segment of the earnings call, in response to RBC Capital Markets analyst Frank George Morgan's question about the timeframe for optimizing the Company's U.K. business, defendant Jacobs represented that Acadia's operations in the U.K. would continue to improve throughout the year. In particular, the following exchange took place:

> **[Frank George Morgan – RBC Capital Analyst:]** Got you. And just one final and I'll hop. It looks like this – maybe turnaround is not the right word, but it definitely looks like we're in the, perhaps, an inflection point in the U.K. I'm just curious, would you agree with that assessment? And really, what kind of time frame do you think it will take to get that business optimized back to where you would like it to be? Thanks.

> **[Jacobs:]** Okay. I think, Frank, we have put – the team over there has put together two good quarters. In the first quarter of this year, you continued to see the improvement. As we've stated before, it's a process and we want to take another step forward in the second quarter. It will take the remainder of the year, I believe, to continue to work on blocking and tackling and getting the agency expense even lower. We're shooting to have total labor costs there under 64% by the end of the year. And so that's a good goal for us. And Trevor and the team over there are working very hard towards that. So, we've taken a couple of small steps, there's more steps to do before we're really running. But we, senior management at the company, are pleased with what is happening in the UK and what our management team there is doing.

130.    On July 31, 2018, the Company held an earnings conference call with analysts and investors to discuss Acadia's financial and operating results for the second quarter ended June 30,

2018. During the call, defendant Jacobs boasted that Acadia's "operations in the U.K. produced their best same facility growth in two years with an increase in same facility revenue of 5.6%, consisting of a 1.6% increase in patient days and a 3.9% increase in revenue per patient day." Defendant Jacobs, however, disclosed that U.K. "[s]ame facility EBITDA margin declined 110 basis points to 21.3% for the quarter," and stated: "We expect continued pressure on labor costs due to the shortage of available personnel and reliance on agency labor."

131.    It was not until November 5, 2018, after the market closed, that the Company issued a press release announcing its financial and operating results for the third quarter ended September 30, 2018 and revealing that the Company had slashed its full year 2017 earnings guidance to be in a range of $2.25 to $2.27 per diluted share from its previously announced guidance of $2.52 to $2.56. In the press release defendant Jacobs explained that Acadia's operating results in the U.K. had continued to deteriorate and attributed the dismal financial results and lowered guidance to a lower census and increased operating expenses. In particular, the press release quoted defendant Jacobs as stating:

> Our U.S. operations performed well with favorable trends in all key operating metrics. However, the third quarter financial results for our operations in the U.K. were affected by a lower census and higher operating expenses than expected. Our operating costs were significantly higher, primarily due to the ongoing nursing and clinical staff shortage and our dependence on higher cost agency labor. Our census did not reach a sufficient level to absorb the higher wages and other operating costs, which adversely affected our margins for the third quarter.

132.    The following day, on November 6, 2018, the Company held an earnings conference call with analysts and investors to discuss Acadia's previously announced financial and operating results for the third quarter of 2018. For the Company's U.K. operations, defendant Jacobs disclosed that "same-facility revenue was up 4.4%," however same-facility EBITDA margins declined 450 basis points to 16.9% for the quarter. Defendant Jacobs stated that Acadia's

U.K. operations "were affected by a lower census and higher-than-expected operating expenses."

Explaining the Company's dismal financial results in the U.K., defendant Jacobs further stated:

> Our operating costs were significantly higher, primarily due to the ongoing nursing and clinical staff shortage and our dependence on higher cost agency labor. The census in our existing healthcare business declined as we experienced a decrease in referrals from the NHS. Similar to industry trends, we continue to experience difficulty with recruiting nurses and clinical staff which requires us to utilize agency labor to fill those positions.

> Because our census did not reach its sufficient level to absorb the higher wages and other operating cost, our third quarter margins and earnings were adversely affected. We expect continued difficulties resulting from the nursing and clinical staff shortage for the foreseeable future.

133.    During the question and answer portion of the conference call, in response to analysts' questions about Acadia's dismal operating results in the U.K. and revised financial guidance, defendant Jacobs stated that in the U.K., "the nurse shortage continues and actually grows. So we see that occurring, continuing and going forward. So that's the reason for the lowering the guidance." Jefferies Financial Group analyst Brian Tanquilut ("Tanquilut") noted the similar challenges Acadia experienced in third quarter 2017 and questioned how the Company's financial guidance was so far off. The following exchange took place between Tanquilut and defendant Jacobs:

> **[Tanquilut:]** . . . we saw challenges in Q3 of last year and margins dropped to 21%. But the 450-basis-point drop, it just seemed really big and it seemed like the last few quarters you had your eye on the ball really closely on staffing. So, what blindsided you here in the quarter?

> **[Jacobs:]** The census was softer than our expectation. And then, we had to use – our discussions with the U.K. operators, we had to use more nurse agency expense just on the base patient. And then, on the new beds that we opened up that we utilized more nurse agency expense there. And the census – it takes a little while for that census to ramp up, I think we'll be fine once it ramps up. It will cover the additional costs of the agency nurse. But those are the two things that hit us in the third quarter, was the softening of the census, but more importantly the nurse agency just was too great.

134. In the two trading days following the news of the Company's disappointing and unexpected financial results and significantly lowered financial guidance, Acadia's stock price fell $5.75 per share, or nearly 13%, to close at $39 per share on November 6, 2018, erasing more than $507 million in market capitalization.

135. The Company's statements regarding the performance of its U.K. operations were materially false and misleading or omitted material information necessary to make them not misleading because the Individual Defendants had no reasonable basis to believe, and did not in fact believe, that Acadia would meet its FY 2017 guidance, as affirmed in press releases and earnings calls, because: (i) the Company's major acquisitions had made the Company dependent on its U.K. operations; (ii) the U.K.'s National Health Service focused on "funding providers based on the quality of their service rather than volume of patients"; (iii) the media had begun portraying Acadia as having a "series of incidents that has raised concerns about the welfare of patients, both private and NHS, at Priory hospitals"; and (iv) the Company had reported disappointing same facility growth of 4.2% for its U.K. facilities in Q4 2016. As a result of the foregoing, the signed SOX certifications by the Company on Forms 10-K were false and misleading.

## H. The Individual Defendants Negligently Issued False and Misleading Statements in Acadia's Proxy Statements

136. Plaintiff's allegations with respect to the misleading statements in the Proxy Statements are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

### 1. The 2017 Proxy

137. On March 10, 2017, Acadia issued its Proxy Statement for the 2017 Annual Meeting of Stockholders, held on May 25, 2017 (the "2017 Proxy" or "2017 Proxy Statement"). In the 2017 Proxy, defendants Bissell, Gregg, Rogers, Grieco, Jacobs, Waud, Petrie, Miquelon, and Gordon solicited stockholder votes to, among other things: (i) reelect defendants Petrie, Miquelon, and Gordon to the Board; and (ii) reject the stockholder proposal to require the Company prepare a sustainability report describing the Company's environmental, social and governance risks and opportunities, including patient safety. Defendants Bissell, Gregg, Rogers, Grieco, Jacobs, Waud, Petrie, Miquelon, and Gordon negligently issued misleading statements with respect to each of these solicited votes.

### i. Misstatements in Support of Reelecting Defendants Petrie, Miquelon, and Gordon

138. In support of defendants Bissell, Gregg, Rogers, Grieco, Jacobs, Waud, Petrie, Miquelon, and Gordon's bid to reelect defendants Petrie, Miquelon, and Gordon, these defendants highlighted their supposed successful oversight of the Company. In particular, the 2017 Proxy assured stockholders that the Board and its Committees periodically assess the significant risks that Acadia faces, including the Company's major risk exposure with respect to its accounting and financial reporting policies and procedures. The 2017 Proxy stated:

**Risk Oversight**

Our Board is responsible for overseeing our risk management process. The Board fulfills its responsibility by delegating many of these functions to its committees. Under its charter, the Audit Committee is responsible for meeting periodically with management to review our major financial risks and the steps management has taken to monitor and control such risks. The Audit Committee also oversees our financial reporting and internal controls and compliance programs.

The Board receives reports on risk management from our senior officers and from the Chairman of the Audit Committee. Also, our Executive Vice President, General

53

Counsel and Secretary provides a summary of our outstanding litigation and any governmental investigations to our Board at each Board meeting.

Additionally, our Board regularly engages in discussions of the most significant risks that we are facing and how these risks are being managed. Our Board of Directors believes that the work undertaken by the Audit Committee, together with the oversight provided by the full Board of Directors, enables the Board to oversee our risk management function effectively.

139. The 2017 Proxy thus assured stockholders that the Board was involved with Acadia's business strategy and actively monitored the Company's risks and compliance with applicable laws and regulations. In reality, the Board was utterly failing in its oversight duties; allowing the Company to operate with inadequate internal controls, all while being informed of continuing operational issues and negative trends in the U.K.

140. The 2017 Proxy harmed Acadia by interfering with the proper governance on its behalf that follows the free and informed exercise of stockholders' right to vote for directors. As a result of the misleading statements in the 2017 Proxy, Acadia's stockholders voted via an uninformed stockholder vote to reelect defendants Petrie, Miquelon, and Gordon to Acadia's Board.

        ii.    Misstatements in Opposition to Adopting a Policy to Require
               the Company Prepare a Sustainability Report

141. The 2017 Proxy also contained a stockholder proposal to adopt a policy to require the Company to prepare a sustainability report describing the Company's environmental, social, and governance risks and opportunities, including patient safety. The Board recommended voting against this proposal, claiming that the Company conducted its business in compliance with applicable laws, including all environmental, health, and safety regulations governing the Company's operations and that Acadia had in place policies and practices concerning environmental, social, and governance issues that made the preparation of the report unnecessary. The Board recommended voting against this proposal for the following reasons:

54

*We conduct our business in compliance with applicable law including environmental, health and safety regulations*, and we work hard to be an exceptional employer, a good neighbor and a good citizen. *The Board of Directors believes that we currently have in place policies and practices concerning environmental, social and governance issues that underscore our commitment to being a good citizen and that make the preparation of a report of the type being requested in the proponent's resolution unnecessary*. After carefully considering this proposal again this year, we have determined that this stockholder proposal would not enhance stockholder value and *we therefore recommend that you vote AGAINST this proposal*.

*We maintain an active Compliance Program and Code of Conduct intended to promote ethics and integrity while completing the mission of helping patients at our facilities attain their full potential by delivering quality behavioral healthcare services in a caring, supportive and financially responsible environment. As a responsible member of our community, Acadia believes it is important to maintain a safe environment*. As required by our Code of Conduct, each employee is responsible for ensuring that all waste products, hazardous materials and other regulated items are stored, handled and disposed of in compliance with applicable laws and regulations. Employees are to immediately report any unsafe storage or improper disposal or release of a hazardous or toxic substance to their supervisor or department head and to the environmental compliance officer responsible for the facility.

While sustainability matters are important to our company, we believe that to prepare and issue a formal report of the type sought by the proponent, which it recommends be prepared with reference to the Global Reporting Initiative ("GRI") Sustainability Reporting Guidelines, would require significant time and expense and produce little added benefit to our stockholders. GRI is an international organization, based in Europe, with offices in the United States and several other countries around the globe. We believe the GRI Guidelines are primarily relevant to much larger corporations, especially those with significant operations in developing countries. While we strive to conduct our business in a socially responsible manner, we do not believe that a report of the type requested by the proponent would provide meaningful benefit to management or useful information to our stockholders.

Moreover, the Board of Directors has concluded that preparing the requested sustainability report would distract our personnel from their most critical mission – fulfilling our key business objectives. Rather than adding staff, hiring consultants and spending the time and financial resources to develop a report that lacks an immediate and tangible return for our stockholders, we believe that our stockholders would benefit most directly by the continued focus of our financial, personnel and other resources on the core elements of our business strategy which include:

- creating a world-class organization that sets the standard of excellence in the treatment of specialty behavioral health and addiction disorders;

- creating behavioral health centers where people receive individualized and quality care that enables them to regain hope in a supportive, caring environment;

- offering an enviable internal culture and environment that encourages and supports both professional and personal growth that our employees are proud of; and

- developing partnerships with physicians, professionals, and payers within the communities we serve through the delivery of high quality specialty behavioral health services at affordable costs while always putting the patient first.

142.    The above statements misleadingly represented that the Company conducted its business in compliance with applicable laws, including all health and safety regulations governing the Company's operations, and that Acadia had in place policies and practices concerning social and governance issues that made the preparation of a sustainability report unnecessary.  In fact, however, as detailed herein, the Company's facilities operated under deplorable conditions, where patients were neglected and often subject to various incidents of misconduct, including sexual assault and wrongful death.

143.    As a result of these misleading statements, the Company's stockholders voted against adopting a policy to require the Company prepare a sustainability report without adequate information necessary to make a reasonably informed decision.

### 2.    The 2018 Proxy

144.    On March 23, 2018, Acadia issued its Proxy Statement for the 2018 Annual Meeting of Stockholders, held on May 3, 2018 (the "2018 Proxy" or "2018 Proxy Statement").  In the 2018 Proxy, defendants Bissell, Gregg, Rogers, Grieco, Jacobs, Waud, Petrie, Miquelon, and Gordon solicited stockholder votes to reelect defendants Bissell and Gregg to the Board, among

other things. Defendants Bissell, Gregg, Rogers, Grieco, Jacobs, Waud, Petrie, Miquelon, and Gordon negligently issued misleading statements with respect to each of these solicited votes.

145. The 2018 Proxy stated the following in support of reelecting defendants Bissell and Gregg:

**Risk Oversight**

Our Board is responsible for overseeing our risk management process. The Board fulfills its responsibility by delegating many of these functions to its committees. Under its charter, the Audit Committee is responsible for meeting periodically with management to review our major financial risks and the steps management has taken to monitor and control such risks. The Audit Committee also oversees our financial reporting and internal controls and compliance programs.

The Board receives reports on risk management from our senior officers and from the Chairman of the Audit Committee. Also, our Executive Vice President, General Counsel and Secretary provides a summary of our outstanding litigation and any governmental investigations to our Board at each Board meeting. Additionally, our Board regularly engages in discussions of the most significant risks that we are facing and how these risks are being managed. Our Board of Directors believes that the work undertaken by the Audit Committee, together with the oversight provided by the full Board of Directors, enables the Board to oversee our risk management function effectively.

146. Defendants' statements misleadingly suggested that the Board: (i) maintained oversight of the processes established to report and monitor systems for material risks applicable to the Company; and (ii) regularly reviewed enterprise-wide risk management, including internal controls and compliance with applicable laws and regulations. As detailed herein, the Board was utterly failing in its oversight duties and allowing the Company to operate with inadequate internal controls, all while being informed of continuing operational issues at several of the Company's facilities.

147. The 2018 Proxy harmed Acadia by interfering with the proper governance on its behalf that follows the free and informed exercise of stockholders' right to vote for directors. As

a result of the misleading statements in the 2018 Proxy, Acadia's stockholders voted via an uninformed stockholder vote to reelect defendants Bissell and Gregg to Acadia's Board.

## VII.  INSIDER SALES BY DEFENDANTS DUCKWORTH, PETRIE, WAUD, GORDON, JACOBS, TURNER, FINCHER, AND GRIECO

148.    While the Company's stock traded at artificially inflated prices as a result of the Individual Defendants' false and misleading statements regarding the Company's compliance with applicable laws and regulations, staffing of its facilities, quality of patient care, and performance of its U.K. business segment, the Insider Selling Defendants used their knowledge of Acadia's material, non-public information to sell their personal holdings.  As officers and directors of Acadia, the Insider Selling Defendants were privy to material, non-public information about Acadia's true business and financial health.

149.    While in possession of this knowledge, defendant Duckworth sold 64,203 shares of his personally held Acadia stock for proceeds of *$4.4 million*.  Defendant Duckworth's sales were timed to maximize profit from Acadia's then artificially inflated stock price.  Duckworth's largest sale—more than $2.5 million—occurred on August 14, 2015 when the stock price traded near its high due to inflation caused by the Individual Defendants' false and misleading statements alleged herein.  Defendant Duckworth's sales are also suspicious given that his stock sales represented 84.6% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 27,585 |
| Shares Sold During Sales Period ("SP") | 64,203 |
| Shares Remaining SP | 11,688 |
| **Total Proceeds from Sales** | **$4,412,469.48** |
| **% of Total Ownership Sold During SP** | **84.6%** |

150.    While in possession of this knowledge, defendant Petrie sold 1,000 shares of his personally held Acadia stock for proceeds of $67,523.40.  Defendant Petrie's sales were timed to maximize profit from Acadia's then artificially inflated stock price.

151.     While in possession of this knowledge, entities associated with defendant Waud sold 10,438,846 shares of Acadia stock for proceeds of *$559.6 million*.  Defendant Waud's sales were timed to maximize profit from Acadia's then artificially inflated stock price.  Waud's largest sale—more than $193 million—occurred on August 14, 2015 when the stock price traded near its high due to inflation caused by the Individual Defendants' false and misleading statements alleged herein.  Tellingly, of Waud's nearly $560 million in insider sales, $544 million—or 97%—was sold before artificial inflation began to leak out of the stock as a result of the first partial corrective disclosure on October 25, 2017.  Defendant Waud's sales are also suspicious given that his stock sales represented 92.9% of his holdings as demonstrated by the table below:

| Total Shares Before Sales | 11,787,259 |
| Shares Sold During Sales Period ("SP") | 10,438,846 |
| Shares Remaining SP | 793,628 |
| **Total Proceeds from Sales** | **$559,622,847.88** |
| **% of Total Ownership Sold During SP** | **92.9%** |

152.     While in possession of this knowledge, entities associated with defendant Gordon sold 5,803,339 shares Acadia stock for proceeds of *$366.5 million*.  Defendant Gordon's sales were timed to maximize profit from Acadia's then artificially inflated stock price.   One of Gordon's largest sales—more than $189 million—occurred on August 14, 2015 when the stock price traded near its high due to inflation caused by the Individual Defendants' false and misleading statements alleged herein.  Tellingly, of Gordons's $366.5 million in insider sales, all $366.5 million—or 100%—was sold before artificial inflation began to leak out of the stock as a result of the first partial corrective disclosure on October 25, 2017.  Defendant Gordon's sales are suspicious given that his stock sales represented 100% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 5,803,339 |
| Shares Sold During SP | 5,803,339 |
| Shares Remaining SP | 0 |
| **Total Proceeds from Sales** | **$366,543,727.21** |
| **% of Total Ownership Sold During SP** | **100%** |

153.    While in possession of this knowledge, defendant Jacobs sold 797,967 shares of his personally held Acadia stock for proceeds of ***$45.1 million***. Defendant Jacobs' sales were timed to maximize profit from Acadia's then artificially inflated stock price. One of Jacobs' largest sales—more than $7.4 million—occurred on August 14, 2015 when the stock price traded near its high due to inflation caused by the Individual Defendants' false and misleading statements alleged herein. Tellingly, Jacobs made his largest sale—$25.3 million, or 57% of his sales—on August 22, 2017, just weeks before Acadia's first partial disclosure of the fraud alleged herein. Defendant Jacobs' sales are suspicious given that his stock sales represented 74.9% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 339,171 |
| Shares Sold During SP | 797,967 |
| Shares Remaining SP | 267,649 |
| **Total Proceeds from Sales** | **$45,137,864.06** |
| **% of Total Ownership Sold During SP** | **74.9%** |

154.    While in possession of this knowledge, defendant Turner sold 294,545 shares of his personally held Acadia stock for proceeds of ***$15.9 million***. Defendant Turner's sales were timed to maximize profit from Acadia's then artificially inflated stock price. In fact, a substantial portion of these sales—206,252 shares—occurred in August 2017, just weeks before Acadia's first partial disclosure of the fraud alleged herein. Defendant Turner's sales are suspicious given that his stock sales represented 100% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 104,758 |
| Shares Sold During SP | 294,545 |
| Shares Remaining SP | 0 |
| **Total Proceeds from Sales** | **$15,886,708.81** |
| **% of Total Ownership Sold During SP** | **100%** |

155.     While in possession of this knowledge, defendant Fincher sold 275,572 shares of his personally held Acadia stock for proceeds of *$15 million*.  Defendant Fincher's sales were timed to maximize profit from Acadia's then artificially inflated stock price.  Defendant Fincher's sales are suspicious given that his stock sales represented 96.1% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 125,922 |
| Shares Sold During SP | 275,572 |
| Shares Disposed (Other) During SP | 11,135 |
| **Total Proceeds from Sales** | **$14,991,789,93** |
| **% of Total Ownership Sold During SP** | **96.1%** |

156.     While in possession of this knowledge, defendant Grieco sold 17,522 shares of his personally held Acadia stock for proceeds of *$862,872*.  Defendant Grieco's sales were timed to maximize profit from Acadia's then artificially inflated stock price.

157.     In sum, defendants Duckworth, Petrie, Waud, Gordon, Jacobs, Turner, Fincher, and Grieco sold over *$1 billion* worth of stock at artificially inflated prices as detailed by the table below:

|  | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| JACOBS | 8/22/2017 | 300,000 | $50.6900 | $15,207,000.00 |
|  | 8/22/2017 | 200,000 | $50.6900 | $10,138,000.00 |
|  | 8/14/2015 | 50,000 | $80.4700 | $4,023,500.00 |
|  | 8/14/2015 | 42,066 | $80.4700 | $3,385,051.02 |
|  | 4/2/2015 | 15,254 | $70.1560 | $1,070,159.62 |
|  | 4/1/2015 | 9,023 | $69.8899 | $630,616.57 |
|  | 2/13/2015 | 29,246 | $62.8055 | $1,836,809.65 |
|  | 11/3/2014 | 133,087 | $59.9505 | $7,978,632.19 |
|  | 5/2/2014 | 19,291 | $45.0000 | $868,095.00 |
|  | **Total** | **797,967** |  | **$45,137,864.06** |

|  | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| TURNER | 8/22/2017 | 206,252 | $50.6900 | $10,454,913.88 |
|  | 8/6/2015 | 16,752 | $82.8479 | $1,387,868.02 |
|  | 3/13/2015 | 11,779 | $69.6817 | $820,780.74 |
|  | 11/3/2014 | 35,167 | $60.1806 | $2,116,371.16 |
|  | 5/2/2014 | 24,595 | $45.0000 | $1,106,775.00 |
|  | **Total** | **294,545** |  | **$15,886,708.81** |

|  | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| FINCHER | 8/22/2017 | 30,000 | $50.6900 | $1,520,700.00 |
|  | 8/22/2017 | 50,000 | $50.6900 | $2,534,500.00 |
|  | 5/2/2017 | 41,483 | $44.9400 | $1,864,246.02 |
|  | 5/1/2017 | 45,000 | $43.9600 | $1,978,200.00 |
|  | 8/12/2016 | 4,604 | $52.5000 | $241,710.00 |
|  | 8/11/2016 | 10,000 | $52.5000 | $525,000.00 |
|  | 8/8/2016 | 8,800 | $52.5609 | $462,535.92 |
|  | 8/14/2015 | 21,888 | $80.4700 | $1,761,327.36 |
|  | 8/14/2015 | 15,406 | $80.4700 | $1,239,720.82 |
|  | 3/4/2015 | 274 | $66.0000 | $18,084.00 |
|  | 3/2/2015 | 788 | $65.1254 | $51,318.82 |
|  | 2/19/2015 | 10,703 | $62.5032 | $668,971.75 |
|  | 11/3/2014 | 24,000 | $60.2835 | $1,446,804.00 |
|  | 11/3/2014 | 5,695 | $61.0017 | $347,404.68 |
|  | 8/13/2014 | 2,489 | $48.0000 | $119,472.00 |
|  | 6/4/2014 | 4,442 | $47.6800 | $211,794.56 |
|  | **Total** | **275,572** |  | **$14,991,789.93** |

| | | | | |
|---|---|---|---|---|
| DUCKWORTH | 8/15/2016 | 16,670 | $54.3300 | $905,681.10 |
| | 8/14/2015 | 31,129 | $80.4700 | $2,504,950.63 |
| | 2/19/2015 | 9,504 | $62.3118 | $592,211.35 |
| | 10/31/2014 | 2,136 | $62.1500 | $132,752.40 |
| | 10/31/2014 | 3,364 | $62.0000 | $208,568.00 |
| | 8/13/2014 | 1,400 | $48.7900 | $68,306.00 |
| | **Total** | **64,203** | | **$4,412,469.48** |

| | | | | |
|---|---|---|---|---|
| WAUD | 11/1/2018 | 41,865 | $45.0000 | $1,883,925.00 |
| | 7/26/2018 | 8,135 | $45.0000 | $366,075.00 |
| | 3/15/2018 | 7,698 | $42.0300 | $323,546.94 |
| | 3/13/2018 | 5,400 | $42.0400 | $227,016.00 |
| | 3/12/2018 | 36,902 | $42.0200 | $1,550,622.04 |
| | 3/6/2018 | 50,000 | $40.0700 | $2,003,500.00 |
| | 3/2/2018 | 70,141 | $38.1900 | $2,678,684.79 |
| | 3/2/2018 | 61,029 | $39.4900 | $2,410,035.21 |
| | 3/2/2018 | 17,750 | $37.6900 | $668,997.50 |
| | 3/2/2018 | 1,080 | $39.9200 | $43,113.60 |
| | 12/15/2017 | 100,000 | $31.7970 | $3,179,700.00 |
| | 8/22/2017 | 984,075 | $50.6900 | $49,882,761.75 |
| | 7/31/2017 | 1,190,000 | $51.6500 | $61,463,500.00 |
| | 7/28/2017 | 34,600 | $53.1300 | $1,838,298.00 |
| | 7/28/2017 | 15,400 | $53.6300 | $825,902.00 |
| | 7/5/2017 | 50,000 | $50.0430 | $2,502,150.00 |
| | 6/22/2017 | 50,000 | $47.5120 | $2,375,600.00 |
| | 6/14/2017 | 724,694 | $45.5300 | $32,995,317.82 |
| | 6/9/2017 | 50,000 | $45.0870 | $2,254,350.00 |
| | 3/15/2017 | 51,118 | $41.0600 | $2,098,905.08 |
| | 3/15/2017 | 2,973,773 | $41.0600 | $122,103,119.38 |
| | 12/16/2016 | 14,000 | $35.1400 | $491,960.00 |
| | 12/15/2016 | 5,087 | $33.6700 | $171,279.29 |
| | 12/15/2016 | 8,913 | $34.2300 | $305,091.99 |
| | 12/14/2016 | 13,300 | $33.2000 | $441,560.00 |
| | 12/14/2016 | 700 | $33.8800 | $23,716.00 |
| | 12/13/2016 | 8,841 | $34.8600 | $308,197.26 |
| | 12/13/2016 | 5,159 | $35.5100 | $183,196.09 |
| | 12/12/2016 | 14,000 | $35.7900 | $501,060.00 |
| | 9/16/2016 | 287,668 | $47.7400 | $13,733,270.32 |
| | 9/16/2016 | 75,000 | $50.7600 | $3,807,000.00 |
| | 9/16/2016 | 521,033 | $47.7400 | $24,874,115.42 |

| | | | |
|---|---|---|---|
| | 9/15/2016 | 123,473 | $49.2400 | $6,079,810.52 |
| | 9/15/2016 | 223,640 | $49.2400 | $11,012,033.60 |
| | 9/14/2016 | 83,861 | $50.1900 | $4,208,983.59 |
| | 9/14/2016 | 46,302 | $50.1900 | $2,323,897.38 |
| | 9/13/2016 | 5,933 | $51.2300 | $303,947.59 |
| | 9/13/2016 | 3,275 | $51.2300 | $167,778.25 |
| | 9/12/2016 | 48,321 | $51.7700 | $2,501,578.17 |
| | 9/12/2016 | 26,679 | $51.7700 | $1,381,171.83 |
| | 8/14/2015 | 2,400,001 | $80.4700 | $193,128,080.47 |
| | **Total** | **10,438,846** | | **$559,622,847.88** |

| | | | | |
|---|---|---|---|---|
| Grieco | 8/11/2017 | 1,000 | $51.6750 | $51,675.00 |
| | 8/11/2017 | 1,000 | $51.7450 | $51,745.00 |
| | 6/16/2017 | 1,000 | $45.4364 | $45,436.40 |
| | 6/16/2017 | 1,000 | $45.4068 | $45,406.80 |
| | 3/10/2017 | 1,000 | $42.5600 | $42,560.00 |
| | 3/2/2017 | 1,000 | $44.6400 | $44,640.00 |
| | 8/25/2014 | 4,522 | $50.6700 | $229,129.74 |
| | 8/21/2014 | 2,000 | $50.3700 | $100,740.00 |
| | 8/19/2014 | 2,000 | $50.2300 | $100,460.00 |
| | 8/19/2014 | 3,000 | $50.3600 | $151,080.00 |
| | **Total** | **17,522** | | **$862,872.94** |

| | | | | |
|---|---|---|---|---|
| PETRIE | 3/6/2015 | 1,000 | $67.5234 | $67,523.40 |
| | **Total** | **1,000** | | **$67,523.40** |

| | | | | |
|---|---|---|---|---|
| GORDON | 8/22/2017 | 998,438 | $50.6900 | $50,610,822.22 |
| | 7/31/2017 | 2,453,764 | $51.6500 | $126,736,910.60 |
| | 8/14/2015 | 2,351,137 | $80.4700 | $189,195,994.39 |
| | | **5,803,339** | | **$366,543,727.21** |
| **GRAND TOTAL** | | **17,692,994** | | **$1,007,525,803.70** |

## VIII. DAMAGES TO ACADIA

158.    As a result of the Individual Defendants' wrongful conduct, Acadia operated its business in patent violation of federal and state laws and regulations.  In addition, the Company was caused to disseminate false and misleading statements, and to omit material information to make such statements not false and misleading when made concerning the Company's (i) adequacy

of staffing; (ii) quality of patient care; (iii) compliance with applicable laws and regulations; (iv) operations and financial prospects in the U.K. This misconduct has devastated Acadia's credibility and caused the Company to lose more than *$1 billion* in market capitalization.

159. As a direct and proximate result of the Individual Defendants' conduct, Acadia has expended, and will continue to expend, significant sums of money. Such expenditures include, without limitation: (i) costs incurred in investigating and defending Acadia and certain officers in the Securities Class Action, plus potentially tens of millions of dollars in settlement or to satisfy an adverse judgment; (ii) costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based, at least in part, on Acadia's artificially-inflated stock price; and (iii) costs incurred from the loss of the Company's customers' confidence in Acadia and its products and services. Acadia has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

160. These actions have irreparably damaged Acadia's corporate image and goodwill. For at least the foreseeable future, Acadia will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Acadia's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## IX. DERIVATIVE ALLEGATIONS

161. Plaintiff brings this action derivatively in her own right and for the benefit of Acadia to redress injuries suffered, and to be suffered, by Acadia as a direct result of the breaches of fiduciary duties by the Individual Defendants.

162. Acadia is named as a Nominal Defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

163.    As alleged above, Plaintiff currently holds shares of Acadia.  Plaintiff also held shares of Acadia at the time of the breaches of fiduciary duties complained of herein.  Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in prosecuting this action.

164.    Because the Individual Defendants face a substantial likelihood of liability for the acts and omissions complained of herein, prosecution of this action, independent of the current Board, is in the best interests of the Company and its stockholders.

165.    The wrongful acts complained of herein subjected, and continue to subject, Acadia to harm.

## X.    DEMAND ON THE BOARD OF DIRECTORS IS EXCUSED AS FUTILE

166.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

167.    The current Board of Acadia consists of defendants Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, Waud, and nondefendant Debra K. Osteen ("Osteen").  Plaintiff has not made any demand on the present Board or the stockholders of Acadia to institute this action because such a demand would be a futile and useless act, as set forth below.

### A.    Demand Is Excused Because Defendants Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, Waud and Nondefendant Osteen Face a Substantial Likelihood of Liability

168.    As alleged above, defendants Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud violated section 14(a) of the Exchange Act by negligently making the misstatements and omissions in the 2017 and 2018 Proxy Statements.  Defendants Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud are responsible for the negligently made statements in the materially misleading Proxy Statements.  It is against public policy to indemnify individuals for violations of section 14(a) of the Exchange Act.  Accordingly, any indemnification provided by the Company to defendants Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud does not

protect them from violations of section 14(a) in the 2017 and 2018 Proxy Statements. As a result, defendants Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud face a substantial likelihood of liability, excusing a demand.

169. Furthermore, as alleged above, defendants Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud utterly failed to implement or cause Acadia to implement a reasonable, relevant, and meaningful system of internal controls designed to ensure critical safety issues and violations of health and safety regulations reached the Board in a timely manner. Given the importance of providing adequate quality care to the Company's revenue stream, the Director Defendants had a duty to ensure the Company adequately addressed operational issues at its facilities. Rather than address the deficient internal controls, these defendants consciously disregarded their duty to act, doing nothing to implement the necessary internal controls. Accordingly, demand is excused as to defendants Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud because they face a substantial likelihood of liability.

170. The Company's Forms 10-K were signed by certain of the Director Defendants as follows: by defendants Bissell, Gordon, Grieco, Miquelon, Petrie, Waud for FYs 2014 and 2015; by defendants Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud for FYs 2016 and 2017; and by defendants , Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud for FY 2018. Accordingly, these defendants are responsible for the misstatements contained therein, and demand is excused as to these defendants because they face a substantial likelihood of liability for any and all such misstatements.

171. In addition, defendants Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud breached their fiduciary duties of loyalty by causing the Company to make improper statements in the Company's press releases and SEC filings regarding Acadia's quality of care,

staffing, compliance with applicable law, operations, financial prospects, and disclosure controls and procedures. Defendants Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud were responsible for reviewing and approving the Company's financial statements. These defendants authorized improper financial and public statements as well as failed to correct other improper statements the Officer Defendants made concerning Acadia. Defendants Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud face a substantial likelihood of liability for causing or allowing the Company to engage in the unlawful conduct alleged herein. As a result, any demand upon defendants Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud to bring suit against themselves or the other defendants would be a useless and futile act.

172. Defendants Bissell and Grieco, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance. The Audit Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements. According to the Audit Charter, the Audit Committee "represents and assists the Board in its general oversight of the Company's accounting and financial reporting processes." Thus, defendants Bissell and Grieco were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Moreover, defendants Bissell and Grieco reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, defendants Bissell and Grieco caused these improper statements. Accordingly, defendants Bissell and Grieco breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, defendants Bissell and Grieco face a substantial likelihood of liability for their breach of fiduciary duties making any demand upon them futile.

173.    Defendants Gordon, Grieco, Petrie, and Waud sold Acadia stock under highly suspicious circumstances.  These defendants, as directors and/or officers of Acadia, possessed material, nonpublic company information and used that information to benefit themselves.  Defendants Gordon, Grieco, Petrie, and Waud sold stock based on this knowledge of material, nonpublic Acadia information regarding the Company's operating performance, growth prospects, adequacy of internal controls over its financial reporting, and the impending decrease in the value of their holdings of Acadia.  Accordingly, defendants Gordon, Grieco, Petrie, and Waud face a substantial likelihood of liability for breach of their fiduciary duties of loyalty.  Any demand upon defendants Gordon, Grieco, Petrie, and Waud is therefore futile.

**B.      Demand Is Excused Because the Board's Professional Ties Preclude Them from Being Able to Conduct an Independent Investigation into the Wrongful Conduct**

174.    Many of Acadia's Board members have long-standing personal and professional ties to one another.  The Board's tangled web of close professional and personal relationships, amount to conflicts of interest that have precluded, and will continue to preclude, it from taking necessary and proper steps to investigate and remedy Acadia's illegal conduct.

175.    Defendant Petrie has several connections to certain of the other defendants through PSI.  Defendant Jacobs co-founded PSI in April 1997 and served as Chairman of PSI's Board of Directors, President, and CEO from April 1997 until November 2010.  While defendant Jacobs was an executive and director at PSI, defendant Petrie served as a PSI director from September 2004 to November 2010.  Defendant Petrie also received substantial compensation from PSI in his capacity as Medical Director at one of the company's medical facilities.  When PSI was acquired by Universal Health Services, Inc. ("UHS"), defendant Petrie received approximately $1.05 million from UHS for his interest in that company.  Given defendant Petrie's

professional ties with defendant Jacobs, defendant Petrie will not vote to initiate litigation against defendant Jacobs (or himself), rendering pre-suit demand on defendant Petrie futile.

176.    Defendants Jacobs, Turner, and Fincher also have long-standing ties to defendant Waud through Waud Capital Partners ("WCP"), a private equity firm focused on investing in the healthcare services and business technology services industries.  Defendant Waud is the founder and managing partner of WCP.  WCP co-founded Acadia in February 2005 along with the three initial members of its senior management team.  According to a *Nashville Post* article, former PSI executives, including defendants Jacobs, Turner, and Fincher, collectively invested approximately $20 million in the Company and joined its management team in a "buy-in" transaction.  Until May 2012, WCP was Acadia's controlling stockholder, owning more than 50% of the voting power of the Company's common stock.  Based on defendant Waud's professional ties with defendants Jacobs, Turner, and Fincher, defendant Waud lacks independence, rendering pre-suit demand on him futile.

177.    In addition, demand is futile because defendants Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud will not vote to initiate litigation against defendants Waud, Jacobs, Turner, and Fincher.  Every member of the Board is beholden to defendants Waud, Jacobs, Turner, and Fincher for their seats on the Board and the perquisites derived therefrom.  Defendants Waud, Jacobs, Turner, and Fincher, who essentially co-founded and funded Acadia, have closely overseen the business operations of the Company since its establishment years ago and defendants Jacobs and Fincher have been significantly involved in the day-to-day business operations at Acadia.  The entire Board is dependent, in significant part, on defendants Waud, Jacobs, Turner, and Fincher for their seats on the Board and would be expelled from their positions of power at Acadia, and the perquisites derived therefrom, for bringing the derivative claims against defendants Waud,

Jacobs, Turner, or Fincher. Accordingly, the Board is disabled from fairly and objectively considering a pre-suit demand to bring, let alone vigorously prosecute, the derivative claims asserted against themselves and defendants Waud, Jacobs, Turner, and Fincher in this action.

178. Finally, defendant Gordon will not vote to initiate litigation against defendant Turner due to his close relationship with defendant Turner. Defendants Gordon and Turner concurrently served as directors at Surgery Partners, Inc., a company which operates surgical facilities, from June 2017 until August 2018. Based upon defendant Gordon's professional ties to defendant Turner, defendant Gordon lacks independence, rendering pre-suit demand on him futile.

### C. Demand Is Excused as to Nondefendant Osteen for Additional Reasons

179. Nondefendant Osteen works primarily for Acadia, and she has received and continues to receive substantial monetary compensation and other benefits from the Company. Nondefendant Osteen is incapable of impartially considering a demand to commence and vigorously prosecute this action because she has an interest in maintaining her principal occupation and the substantial compensation she receives in connection with that occupation. Accordingly, nondefendant Osteen lacks independence from defendants Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud. This lack of independence renders nondefendant Osteen incapable of impartially considering a demand to commence and vigorously prosecute this action.

180. In addition, according to the Company's most recent Proxy Statement filed with the SEC on March 21, 2019, nondefendant Osteen is also admittedly not independent. Thus, nondefendant Osteen is demonstrably incapable of impartially considering a demand to commence and vigorously prosecute this action.

181. The Company's Form 10-Q for Q1 2019 contained a signed certification pursuant to SOX by nondefendant Osteen. Accordingly, nondefendant Osteen is responsible for the

misstatements contained therein, and demand is excused as to nondefendant Osteen because she faces a substantial likelihood of liability for any and all such misstatements.

182.    Plaintiff has not made any demand on stockholders of Acadia to institute this action because such a demand would be a futile and useless act for the following reasons:

   a.    Acadia is a publicly traded company with hundreds, if not thousands of stockholders, with approximately 88.7 million shares outstanding as of May 1, 2019;

   b.    making a demand on such a number of stockholders would be impossible for plaintiff, who has no means of collecting the names, addresses, and/or phone numbers of Acadia stockholders; and

   c.    making demand on all stockholders would force plaintiff to incur excessive expense and obstacles, assuming all stockholders could even by individually identified with any degree of reasonable certainty.

## XI.    CLAIMS FOR RELIEF

### COUNT I

### Violation of Section 14(a) of the Exchange Act
### (Against the Director Defendants)

183.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

184.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

185.    The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders, which were contained in the Proxy Statements. In the Proxy Statements, the Board solicited stockholder votes to reelect

themselves to the Board and reject the stockholder proposal to require the Company to prepare a sustainability report.

186. The Proxy Statements, however, misrepresented and failed to disclose that: (i) the Company's U.K. operations did not provide the "competitive strength" driving supposed profitability but were suffering from negative trends in the U.K.'s healthcare services industry; (ii) the Company was noncompliant with applicable law, subjecting the Company to regulatory scrutiny and jeopardizing its government revenues; (iii) the Company was significantly understaffed at its facilities at the expense of patient safety and care; (iv) the Company failed to maintain adequate disclosure controls and procedures with respect to Acadia's operations; (iii) the Company failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention; (iv) the Company's public statements about the foregoing were misleading; and (v) Acadia faced significant reputational harm when the truth would inevitably unfold. By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, Acadia misled and/or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding Acadia's recommendation to reelect certain Board members and reject the stockholder proposal to require the Company to prepare a sustainability report.

187. The misleading information contained in the Proxy Statements was material to Acadia's stockholders in determining whether to elect these defendants and reject a stockholder proposal that would require the Company to prepare a sustainability report. This information was also material to the integrity of the directors that were proposed for election to the Board. The proxy solicitation process in connection with the Proxy Statements was an essential link in the

reelection of nominees to the Board and the decision not to adopt a provision requiring the Company to prepare a sustainability report.

188.     Plaintiff, on behalf of Acadia, thereby seeks relief for damages inflicted upon the Company based upon the misleading Proxy Statements in connection with the improper reelection of the members of the Board and vote against the stockholder proposal for the Company to adopt a policy requiring the Company to prepare a sustainability report.

## COUNT II

### For Contribution for Violations of §§ 10(b) and 21D of the Exchange Act
### (Against Defendants Jacobs, Turner, and Duckworth)

189.     Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

190.     Defendants Jacobs, Turner, and Duckworth are named defendants in the Securities Class Action.

191.     Acadia is named as a defendant in the Securities Class Action, which asserts claims under the federal securities laws for, *inter alia*, violations of § 10(b) of the Exchange Act.  If the Company is found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of some or all of the defendants as alleged herein.  The Company is entitled to receive contribution from those defendants in connection with the Securities Action against the Company.

192.     Defendants Jacobs, Turner, and Duckworth as directors and officers and otherwise, had the power and/or ability to, and did, directly or indirectly, control or influence the Company's general affairs, including the content of public statements about Acadia, and had the power and/or ability, directly or indirectly, to control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and Rule 10b-5.  Further, defendants Jacobs, Turner,

and Duckworth are liable under § 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

193.     As a result, defendants Jacobs, Turner, and Duckworth damaged Acadia and are liable to the Company for contribution.

194.     Plaintiff, on behalf of Acadia, has no adequate remedy at law.

**COUNT III**

**Breach of Fiduciary Duties**
**(Against the Individual Defendants)**

195.     Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

196.     The Individual Defendants owed and owe Acadia fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Acadia the highest obligation of good faith, fair dealing, loyalty, and due care.

197.     The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Acadia, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

198.     The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that: (i) the Company's U.K. operations did not provide the "competitive strength" driving supposed profitability but were suffering from negative trends in the U.K.'s healthcare services industry; (ii) the Company was noncompliant with applicable law, subjecting the Company to regulatory

scrutiny and jeopardizing its government revenues; (iii) the Company was significantly understaffed at its facilities at the expense of patient safety and care; (iv) the Company failed to maintain adequate disclosure controls and procedures with respect to Acadia's operations; (v) the Company failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention; (vi) the Company's public statements about the foregoing were misleading; and (vii) Acadia faced significant reputational harm when the truth would inevitably unfold. Accordingly, the Officer Defendants breached their duties of care and loyalty to the Company.

199. The Director Defendants, as directors of the Company, owed Acadia the highest duty of loyalty. These defendants breached their duty of loyalty by recklessly permitting the improper statements detailed herein. The Director Defendants knew or were reckless in not knowing that: (i) the Company's U.K. operations did not provide the "competitive strength" driving supposed growth and profitability; (ii) the Company failed to maintain adequate disclosure controls and procedures with respect to Acadia's operations; (iii) the Company failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention; (iv) the Company's past and continuing non-compliance with rules and regulations concerning health and safety would subject the Company to regulatory scrutiny and jeopardize its government revenues; (v) the defendants' public statements about Acadia's business, operations, and financial prospects were misleading; and (vi) Acadia faced significant reputational harm when the truth would inevitably unfold. Accordingly, the Director Defendants breached their duty of loyalty to the Company.

200. The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

201. The Insider Selling Defendants breached their duty of loyalty by selling Acadia stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's stockholders. The information described above was proprietary, nonpublic information concerning the Company's future business prospects. It was a proprietary asset belonging to the Company, which defendants Fincher, Gordon, Grieco, Jacobs, Turner, and Waud used for their own benefit when they sold Acadia common stock.

202. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Acadia has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

203. Plaintiff, on behalf of Acadia, has no adequate remedy at law.

## COUNT IV

### Waste of Corporate Assets
### (Against the Individual Defendants)

204. Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

205. As a result of the Individual Defendants' failure to implement adequate internal controls to ensure that the Company's SEC filings were accurate, Acadia is subject to the Securities Class Action. The Individual Defendants have caused Acadia to waste its corporate

assets by forcing the Company to expend valuable resources in defending itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

206. As a result of their waste of corporate assets, the Individual Defendants are liable to the Company.

207. Plaintiff, on behalf of Acadia, has no adequate remedy at law.

**COUNT V**

**Unjust Enrichment**
**(Against the Individual Defendants)**

208. Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

209. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Acadia. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Acadia.

210. The Insider Selling Defendants sold $1 billion worth of Acadia stock while in possession of material, adverse nonpublic information that artificially inflated the price of Acadia stock. As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

211. Plaintiff, as a stockholder and representative of Acadia, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

212. Plaintiff, on behalf of Acadia, has no adequate remedy at law.

**COUNT VI**

**Insider Selling**
**(Against the Insider Selling Defendants)**

213.     Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

214.     At the time the Insider Selling Defendants sold their Acadia stock, they knew the information described herein and sold such stock on the basis of such information.

215.     The information described herein was proprietary, non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Acadia stock.

216.     At the time of their stock sales, the Insider Selling Defendants knew the truth about the Company's financial condition and future business prospects, specifically related to, among other things, the Company's quality of patient care, staffing levels, performance with respect to its U.K. business operations, and compliance with applicable laws and regulations.

217.     The Insider Selling Defendants' stock sales while in possession and control of this material adverse, non-public information was a breach of their fiduciary duty of loyalty and good faith.

218.     Since the use of the Company's proprietary information for their own gain constitutes a breach of fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that the Insider Selling Defendants retained thereby.

219.     By reason of the foregoing, Acadia was damaged.

220.     Plaintiff, on behalf of Acadia, has no adequate remedy at law.

## XIV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Finding that a stockholder demand on the Acadia Board would have been a futile and useless act;

B.      Finding that the Individual Defendants have breached their fiduciary duties to the Company and violated the federal securities laws;

C.      Directing Acadia to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Acadia and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other action as may be necessary to place before stockholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's internal reporting and financial disclosure controls;

- a proposal to declassify the Board;

- a proposal to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

- a proposal to ensure the accuracy of the qualifications of Acadia's directors, executives, and other employees;

- a proposal to require an independent Chairman of the Board;

- a provision to permit the stockholders of Acadia to nominate three candidates for election to the Board;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls; and

- a provision to appropriately test, and then strengthen, the Company's internal-operational control functions.

D.     Against each of the Individual Defendants in favor of Acadia for the amount of damages sustained by Acadia, as a result of the breaches of fiduciary duties by each Individual Defendant as alleged herein, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

E.     Requiring the Individual Defendants to return to Acadia all compensation and remuneration of whatever kind paid to them by Acadia during the time that they were in breach of the fiduciary duties they owed to Acadia;

F.     Directing the Individual Defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that Acadia's directors, officers, and employees do not engage in wrongful and illegal practices;

G.     Granting appropriate equitable and/or injunctive relief to remedy the Individual Defendants' misconduct, as permitted by law;

H.     Awarding to Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

I.     Granting such other and further relief as this Court deems just and equitable.

## XV.     DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

DATED:  May 23, 2019                      **DAVIES, HUMPHREYS & REESE PLC**

                                          *s/ Wade B. Cowan*
                                          WADE B. COWAN (BPR # 9403)

                                          85 White Bridge Road, Suite 300
                                          Nashville, TN 37205
                                          Telephone: (615) 256-8125
                                          Facsimile: (615) 242-7853
                                          Email: wcowan@dhhrplc.com

**JOHNSON FISTEL, LLP**
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA 30064
Telephone: (770) 200-3104
Facsimile: (770) 200-3101
Email: MichaelF@johnsonfistel.com

**JOHNSON FISTEL, LLP**
FRANK J. JOHNSON
655 West Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
Email: FrankJ@johnsonfistel.com

*Attorneys for Plaintiff Helen Beard*

DocuSign Envelope ID: BC93C57C-519E-4417-B9E6-1C9E16AE2FC5

## VERIFICATION

I, Helen Beard, verify that I have reviewed the foregoing Verified Stockholder Derivative Complaint and the allegations as to me are true and correct and that the other allegations based upon information and belief are true and correct.

Dated: May 20, 2019

DocuSigned by:

_Helen Beard_

7CAE6221D93D479...

Helen Beard